LITTLE
ROCK;
Jan'y 1839

HAWKINS
vs.
THE GOV-
ERNOR.

# RICHARD C. HAWKINS *against* THE GOVERNOR.

PETITION *for rule to show cause, why a mandamus should not issue.*

The case of *Taylor* vs. *The Governor*, (*ante p.* 21,) does not decide that a mandamus can issue to the Governor.

The Governor of the State is not amenable to the judiciary for the manner in which he performs, or for his failure to perform his legal or constitutional duties.

His acts, being political, must of course be politically examined in the manner pointed out by the Constitution.

The Constitution assigns to him no *ministerial* duties to be performed, nor can the law enjoin upon him any such duty.

The principle, that, where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, the individual injured has a right to resort to the law for redress; applies only to such officers as have no legal or constitutional discretion left them. All the officers of the government, except the President of the United States, and the Executives of the different States, are liable to have their acts examined in a court of justice.

Whenever the heads or officers of a department are the political or confidential agents of the Executive, appointed merely to execute his will, it is clear that in such cases their acts are his acts—and whatever opinion may be entertained of the manner in which their discretion may be used, there is no power in the courts to compel that discretion.

But if the Governor had signed and sealed the commission of an officer, and delivered it to the Secretary of State to be attested and recorded, the duties of the Secretary being in that behalf purely ministerial, the court would, by *mandamus, compel him to perform them.*

Each department of the government has the right to judge of the Constitution for itself—but each is responsible for an abuse or usurpation of power, in the mode pointed out by the Constitution.

The Governor is placed under a double responsibility—that of the right of suffrage, and that of impeachment. He is answerable in no other way for his official conduct, while he continues in the exercise of his office.

All the duties imposed upon the Executive by the Constitution, including the issuing of commissions, are strictly and exclusively political.

The Supreme Court therefore has no power to award a mandamus to the Governor to compel him to grant a commission.

This case was disposed of on the question of jurisdiction. It is therefore only necessary to state that it was a petition for a rule upon James S. Conway, Governor of the State, to show cause why a peremptory mandamus should not be awarded against him, commanding him to issue a commission to the petitioner, Richard C. Hawkins, as Commissioner of Public Buildings.

CUMMINS & PIKE, for the application:

The first question in this case is, has this court the power to award a

LITTLE
ROCK,
Jan'y 1839

HAWKINS
vs.
THE GOV-
ERNOR.

mandamus to the Governor, where he wrongfully withholds a commission, which he is by law required to issue.

This, we conceive, has been settled by this court in the case of *Taylor* vs. *The Governor*, (*ante*, 21) where it was decided that this court had the power to award a mandamus—inasmuch as that case was of the same nature with the present; and it may well be concluded that the court meant to say that it had the power to award the mandamus to the Governor, in case the applicant was clearly entitled to his commission—as otherwise that case would have been disposed of for want of jurisdiction, without the elaborate investigation of the applicant's right into which the court went.

In the case of *Marbury* vs. *Madison*, I *Cond. Rep.* 267, the Supreme Court of the United States decided, that "where the Legislature proceeds to impose on that officer, (the Secretary,) other duties (than his political ones;) when he is directed peremptorily to perform certain acts, when the rights of individuals are dependant on the performance of those acts, *he is so far the officer of the law;* is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others." By the law creating the office of Commissioner of Public Buildings, the Governor is required to commission that officer. If that law was in force at the time of the election, all that the Governor is required to do, is to perform a *ministerial* act—and he thus comes within the reasoning above quoted. For—as that court further said—"where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for remedy." And the whole reasoning of the court in that case applies so directly to the present, that it is needless to do more than refer the court to it.

HEMPSTEAD, *contra:*

The first question is, can a mandamus be awarded against the Governor of the State?

The doctrine in the case of *Marbury* vs. *Madison* is usually referred to as authorizing such a procedure, and however vain it may appear, it can probably be shown that it does not possess the force of a judicial precedent, except as to one isolated point—of *jurisdiction alone.*

Upon a careful examination of the case as reported in I *Cond. Rep.* 267, it appears that one principle alone is settled by the court, and that

LITTLE
ROCK,
Jan'y 1839

Hawkins
vs.
THE GOV.
ERNOR.

is, "*the authority given to the Supreme Court, by the act establishing the Judicial Courts of the United States, to issue writs of mandamus to public officers, appears to be warranted by the constitution,*" 283.

This one point comes undoubtedly within the doctrine of *stare decisis*, and so far is a precedent. But here the idea of a precedent ends, and the remainder is but an *obiter*—an opinion entitled to respect only, as the emanation of a towering and philosophic mind. No one can be more ready to admit, that as a man, Chief Justice Marshall embellished society—as a judge, illuminated the bench. But the most profound sagacity may err, and as said by Blackstone—the *law* and the *opinion of the Judge* are not always convertible terms, or one and the same thing, since it sometimes may happen that the Judge may *mistake* the law, and the decision is then not *bad law* merely, but *no law at all*. The court disclaimed the right to issue a mandamus, because the grant of power was unconstitutional. If there was no jurisdiction, how could it be rightfully determined whether a mandamus could be awarded in a supposed case? Does it not present a strange anomaly for a Judge to say that he has not jurisdiction, and still declare what the court *might* or *would* do if it had. Can any such opinion be a precedent fit to be referred to as binding, to say nothing of its indelicacy?

Questions of jurisdiction reach the very foundation of the authority of courts, to take judicial cognizance of a case, and if they cannot, in the appropriate language of the law, hear and determine it, the cause is *coram non judice*, and every thing done is a nullity. What principles can be settled except such as relate to the jurisdiction of the court? None. Every thing else is within the description of *obiter dictum*, and is not, therefore, to be regarded as evidence of the law.

The reasoning or facts of such an opinion may be looked to in the investigation of a similar subject, for the purpose of sharpening the intellect, but can never be cited in a court of law as a judicial precedent. Technically speaking, there are nothing like facts in issue, upon which the judgment of law can be rendered.

*A mandamus cannot issue at all to the Executive of the State.*

First: Because, by article third of the constitution of Arkansas, the powers of the State government are divided into three distinct departments, each of them to be confined to a separate body of magistracy —those which are legislative to one, those which are executive to another, and those which are judicial to another. Out of an abun-

LITTLE
ROCK;
Jan'y 1839

HAWKINS
*vs.*
THE GOV-
ERNOR.

dance of caution, a clause is annexed prohibiting any person, or collection of persons, being of one of those departments, from exercising any power belonging to either of the others, except in instances directed or permitted.

That a thing which cannot be done directly, can never be done by the agency of indirect means, is a principle too well established to be controverted, and its application will be readily seen.

If the power to do a thing is vested in the executive department by the constitution, how can the judiciary control the performance of it, without at the same time exercising a power belonging to another department? It is the court that requires and commands the act to be done, and the executive can have no volition, if it be true that this court hath jurisdiction over the executive department.

All jurisdiction implies superiority of power, and that it can exist without the means to enforce it, is an anomalous idea which nobody can understand. A court will surely be cautious of placing its authority in a situation to be disregarded, and a little examination will show how painful that situation would be found.

If the Executive will not commission the individual when *peremptorily commanded*, can he be punished for a contempt, incarcerated in a prison, for disobedience to the mandate of the court? His executive functions must then be suspended, and the will of the people daringly outraged. If that imprisonment can last for one hour, it may last for an indefinite time, depending upon discretion alone. Where is the limit to that discretion—where the revisory power? The judges are as liable to err as the executive, and how, it may be asked, was this frightful and tremendous jurisdiction obtained?

Is there any meaning in the constitution when it expressly prohibits one department from exercising the powers belonging to another? Is the executive any thing more than an automaton, the mere creature of this court, if such powers may be rightfully exercised?

What is there sacred in an election by the people, if the design and end of that election may be substantially annulled at any moment, by depriving the executive of his constitutional functions? Can the court appoint an individual to perform the duties of Governor *temporarily*, or will the judges themselves attend to execute the law, or, to speak more correctly, declare what it is, and then execute it?— Such an absurdity never entered the imagination.

To whom must the people look for the execution of a trust confided

LITTLE
ROCK,
Jan'y 1839
HAWKINS
vs.
THE GOV.
ERNOR.
by their sovereign will to one man? Must they look to their rightful executive, immured within the walls of a dungeon for disobedience to the process of a court, commanding an act involving executive discretion; perhaps, too, against both policy and law?

The Governor solemnly swears to support the constitution, not as judges understand it, but as he himself understands it. Can any human tribunal force upon him the unpleasant dilemma of choosing between perjury, on the one hand, and punishment for resisting what he deems an unlawful mandate, on the other? He must construe the constitution for himself, independent of the opinion or authority of judges.

But it is said that the executive is sufficiently protected from any assumption of power by the judicial department, because nothing but mere *ministerial* acts can be controlled by judicial anthority.

If the distinction between *political* and *ministerial* acts, as applied to the chief executive officer of the State, exists, and can be distinctly defined, let us see what sort of guard it furnishes.

Who is to decide the question between acts *ministerial* and *political*? Must not the court?

Is not the protection a fancied one, and may not the rights of the executive be as effectually taken away, with as without the distinction, especially when it is remembered that courts sometimes construe *may* to mean *shall*—or, in other words, mandatory language into language implying discretion; and so *vice versa*? If the province of construction did not rightfully belong to the courts, and to this court as the highest judicial tribunal in the State, the idea might deserve a more serious consideration than it can now receive.

The constitution declares that the Governor *shall* fill vacancies in offices, the election to which is vested in the General Assembly during the recess of the General Assembly, by granting commissions which shall expire at the end of the next session. What if he should fail to fill a vacancy?

This power might be called *ministerial;* and if any authority can be exercised over the executive, directly or indirectly, by a tribunal professedly co-ordinate, that tribunal might proceed to ascertain when and how the vacancy happened, and command the Governor to fill it, by granting a commission.

If this could be legitimately done, why might not the Governor be required to commission a particular individual? It is putting an extreme

case, but one which portrays the fallacy of the idea, that the Governor of the State is subordinate to the Supreme, or any other Court, in the performance of any of his duties.

That the three departments in the State government are co-ordinate is beyond question; and it is a gross contradiction in language to say that each are co-ordinate, and *yet in some things, one is subordinate to another.*

To command is an attribute of sovereignty—to obey, the fate or duty of an inferior. A command carries along with it the notion of supe-riority, whether that superiority is acquired by compact or usurpation. It is not conferred upon the judiciary of the State, with regard to the executive department, by any compact, but on the contrary expressly denied.

If attempted at all, and no remedy could be found of a constitutional character, it would be high time to invoke, with the feelings and earnestness of a patriot, the interposition of a power behind the con-stitution, which can make and unmake governments, and will ever be found in readiness to resist any usurpation, from whatever source it may emanate.

To counterbalance such reasoning, it is significantly said by the advocates of this judicial power, that no safeguard is thrown around individual rights, and that the executive may trample them down with impunity.

It is a satisfactory answer to say, that the Governor is subject to impeachment for any mal-practice, or misdemeanor in office. The mode is prescribed and cannot be mistaken. In case of impeachment, among other contingencies, an officer is designated, who is to exercise the authority and duties of Governor, until another shall be elected and qualified, or until he shall be acquitted. This very provision against any suspension of the executive functions, is another strong argument to show that it could never have been the intention of the convention, to vest in the Supreme Court any original jurisdiction over the Governor, which would draw along the right of punishing the contempt of their mandate, and that punishment would ordinarily amount to, or induce a suspension of all the Governor's powers.

It cannot be reasonably supposed, that in some cases it was provided against with extreme caution, and that in others it rested on discre-tion alone—incapable of being known, impossible to be defined by legal landmarks, and without any remedy, save in the mercy of mod eration.

LITTLE
ROCK,
Jan'y 1839

HAWKINS
vs.
THE GOV.
ERNOR.
Putting all this out of view, and admitting, for a moment, that the courts do possess the power claimed for them by some, may it not also be asked, what safeguard the citizen can have against the oppression and tyranny of the judges, but their impeachment. What other punishment can he invoke, what other security from a repetition of wrongs? The Governor cannot remove but by the intervention of the Legislature. Judges have passions and prejudices like other men, and the ermine constitutes no exemption from error.

But such presumptions are never to be indulged with regard to public officers, for being possible only; and, deducible from the occasional wickedness of man, they can never furnish correct data for opinion, but form an exception, and therefore possess little or no weight as argument.

The truth is, that the Governor is placed at the head of the executive part of the government—responsible by way of impeachment, and is further politically responsible to the people, for the uprightness of his administration, and for a faithful execution of the laws. That responsibility is not a mere empty name, but solemn and substantial.— With a written constitution before him, bound to its support by the sacredness of an oath, if he wantonly disregards it, he cannot escape the vigilance of the people's representatives; and for a lame and inefficient performance of his trust, cannot fly the denunciations of the people themselves.

The object of the federal constitution, and of the State constitutions likewise, is a well balanced division of power among the different departments, making neither subordinate, but, on the contrary, independ ent of each other in the exercise of their several powers. The advantages of a mixed government are combined; but the very moment that one branch obtains an uncontrollable superiority over another, the beauty of the system has perished, the necessary equilibrium has gone, and society must be constantly agitated by the assertion of despotic power on the one hand, and manly resistance on the other. Anarchy and confusion must ensue, so that instead of providing ourselves with a form of civil polity, protective of the freedom of the citizens, we have entrusted its keeping to accident and uncertainty. The executive cannot *command* the judiciary to do a single act, nor the Legislature to pass or repeal a law; nor upon a parity of reasonning, can either of those branches *command* the executive, and punish him if he disobeys. In their appropriate spheres, they are certainly independ-

ent of each other, and only responsible in the mode designated in the constitution, and in no case accountable to each other.

CUMMINS & PIKE, *in response:*

It is contended that this court has no power, in any possible case which may arise, to issue a mandamus to the Governor of the State. To establish this proposition, it was first necessary to dispose of the case of *Marbury* vs. *Madison*, and that is effected in the most cavalier manner, by declaring so much of the decision in that case as has any reference to the present, to be an *obiter dictum*, and therefore not worthy of, or needing before this court an examination or refutation.— Chief Justice Marshall, it is admitted, embellished society and illuminated the bench, but his decision and that of the Supreme Court is not worth even a refutation here, because it is an *obiter dictum*. It occurs to us that the gentlemen would have done their cause more service by showing the fallacy of the argument, and the weakness of the conclusions of Chief Justice Marshall, than by setting the whole case aside as an *obiter dictum*.

The full authority of that case has been recognized by all the distinguished commentators—by Dane, Story, and Kent; and by the Supreme Court of the United States, in *McIntire* vs. *Wood,* 7 *Cranch,* 504; *McClung* vs. *Silliman,* 6 *Wheaton,* 598; and *ex parte Crane,* 5 *Peters,* 190. Why not show by what judicial tribunal that case has been overruled, modified, or doubted? In no one judical decision, in the elementary treatise of no jurist, has it been impugned or questioned.

It is contended that a mandamus connot issue in this case, 1st, Because the legislative department is independent of the judiciary, and one cannot exercise any power belonging to the other. This argument would apply as well to any executive officer, as to the Governor. If it means any thing, it means this, that the judiciary cannot compel the performance of any act which an executive officer ought to do under the law; nor can it prevent the performance of any act which any such officer may attempt to do, if he pretends to do it as an executive officer.

Yet executive officers have always been held amenable to courts of justice for their official acts. Anciently the King of England might be sued as a private person. In 2 *Salk.* 625, will be found a note of Lord Bellamont's case, who was prosecuted for an official act

LITTLE
ROCK,
Jan'y 1839

HAWKINS
vs.
THE GOV-
ERNOR.
as Governor of the Province of New York.   In *Mostyn* vs. *Fabrigas*, *Cowp.* 161, Lord Mansfield said that a citizen of Minorca might sustain an action against the Governor of that Island for an act of official misconduct.   *Livingston* vs. *Jefferson*, 1 *Brock*. 203, was a case in which the defendant was sued for an act done by him as President of the United States.   In *Marbury* vs. *Madison* the court decided that a mandamus could issue to the Secretary of State to enforce the issuance of a commission; and in *Kendall* vs. *United States*, 12 *Peters*, 524, the same court decided that a mandamus could issue to the Postmaster General to compel him to pay over a balance directed to be paid out by Congress.

The Circuit Court of the District of Columbia, whose judgment was in the latter case affirmed, say, " Every public officer who neglects or refuses to perform a mere ministerial duty, whereby an individual is injured, is legally responsible to that individual in some form or other; and a mandamus is one of the mildest forms of action that can be used." In *Marbury* vs. *Madison*, the court said that whether the writ should issue, " does not depend on the office, but the nature of the offence."

In the case of Kendall, the Attorney. General, Butler, expressly admitted, that " as the ordinary character of an officer's functions would not always determine the true nature of a particular duty imposed by law, I further agree, that if an executive officer, the head of a department, or even the President himself, were required, by law, to perform an act merely ministerial, and necessary to the completion or enjoyment of the rights of individuals, he should be regarded, *quoad hoc*, not as an executive, but as a merely ministerial officer; and therefore liable to be directed and compelled to the performance of the act, by mandamus, if Congress saw fit to give the jurisdiction."

This admission was made by the counsel for the Postmaster, and the legal adviser of the executive of the United States.   It is therefore entitled to some respect.

Again it is contended, that whenever the judiciary controls the performance of any executive act, it usurps the powers of the executive, and thereby violates the constitution.   If we admit this to be true, it has nothing to do with the case, because the issuance of the commission is not an executive, but a ministerial act.   It is has been so decided to be, in *Marbury* vs. *Madison*, and that decision has never been controverted.

LITTLE
ROCK,
Jan'y 1839

HAWKINS
vs.
THE GOV-
ERNOR.

But the judiciary might control the action of another department, or both departments, and that not directly but indirectly, by declaring a law which has passed the Legislature and received the signature of the executive, to be unconstitutional. If we had chosen to take a writ of quo warranto against the present occupant of the office here in dispute, and this court were clearly of the opinion that our client was entitled to the office, and that the appointment by the Governor was void, would they not *oust* the incumbent? It is a fallacious doctrine that the judiciary is not supreme to the other departments. It is the interpreter of the laws and the constitution, and has the power virtually to annul their acts, by declaring them unconstitutional, and so rendering them inoperative.

But the argument on which most reliance is placed, is, that as the court would have no power to enforce its mandate, it will issue none. The question is significantly asked, how can the executive be punished for contempt? Can he be imprisoned? If so, his executive functions are suspended, and the will of the people daringly outraged. What is there sacred in an election by the people, if this is the case? Can the court appoint an executive?—or will they act as the executive?

These are all very portentous questions—significant, and put with a very grave solemnity. But unfortunately, they will equally apply, and could just as pertinently be asked, if we were now debating whether a mandamus should issue to a Circuit Court Clerk. If he too were committed for contempt, "the will of the people would be daringly outraged"—and the wit of man cannot devise or discover a distinction between the two cases.

We are not aware of any power in the land superior to the laws.— We know of no power higher and stronger than the supreme Tribunals of justice. What if the Governor, being the commander in chief of the militia, were to enter this hall at the head of a file of men, and order your honors to vacate that bench!—Would you do so because the executive and judiciary are independent, and because you have no power to punish the Governor for contempt? Not so. The temple of justice could not be so closed; nor would you recognize in the lawless intruder the executive of the State—but an individual committing a gross contempt in your presence; and you would find the people sustaining you and enforcing your mandates. So in this case, if your mandate issues, the Governor is *sworn* to obey it. Nor is he sworn to support the constitution and execute the laws as *he* understands them. He is

LITTLE
ROCK,
Jan'y 1839

HAWKINS
*vs.*
THE GOV-
ERNOR.
sworn to support the constitution. The constitution makes you the interpreters of the law; and when you have decided, the executive usurps judical power, and a judical power too above the powers of this tribunal of last resort, when he adopts any other construction of the laws than the one you have settled. If when your mandates issues, the Governor refuses to obey it, he does not act as Governor in so refusing; but he stands before you as any other private individual.

Nor is it necessary that you should have the power to compel obedience. When the Supreme Court of the United States reverses the judgment of the Supreme Court of a State, has it the power to *enforce* its judgment by ordering the Supreme Court to enter a new judgment in conformity with its opinion. It has not that power in the sense in which the gentleman uses the word. It cannot imprison the judges of the State Court for contempt for refusing to obey the mandate; nor can it order one of its own officers to expunge the old judgment, and enter the new. But it has a moral power; and it also has the power to make the judgment below inoperative.

What if you were called on to issue a mandamus to the Secretary of State—the Auditor or the Treasurer? Would you decline to do so, because they are executive officers—because you could not enforce your mandate—because you could not imprison them for contempt, without " defeating the election of the people," and committing " a daring outrage on their will?"

It is further contended, that if the court grant this application, they can with equal right issue a mandamus to the Governor to fill a vacancy in an office, between the sessions of the General Assembly. This is an ingenious attempt at the *reductio ad absurdum*, but unfortunately the case put by the gentleman has none of the features of the present one. We claim a mandamus here, because the issuing a commission is a ministerial act—because the applicant has been elected, and has a vested right to the office, and to the evidence of his office—and because it is a matter in which the executive has no discretion, but merely acts as a clerk or other ministerial officer. In the other case, the Governor although it would be his duty to fill the vacancy, would yet have a discretion as to the person on whom he should confer it: public rights, but not individual rights, would be involved: no person would have a vested right to the office, and the act of filling the office is part of the Governor's prerogative—an executive act.

The whole argument in regard to the three departments being

co-ordinate, co-equal, and independent, is an assumption.  Does the constitution declare them so?  Not at all.  And that such is not the fact is apparent, because the judiciary can in effect annul an act of either or both the others.

It is manifest that all the arguments advanced by the gentleman are but secondary.  The true ground is not touched upon, although without it the positions are of no more avail than if taken, as they could be, in a case where a mandamus should be asked to a clerk.—There is behind all these light-armed, subsidiary arguments, a main body, which consists in a vague, indefinite, shapeless idea of the innate and inherent majesty of the executive office.  While we contend that neither power, exemption, privilege or impunity belongs to or attaches to the executive, other than such as is conferred upon and secured to him by the words or necessary intendment of the constitution, they, on the other hand, assimilate his office to the regal dignity of the Crown of England, and from the nature of the office infer his non-subjection to the process of the law.  They contend that he cannot be arrested even for crime, until by impeachment he is disrobed of the garment of sanctity and immunity, thrown around him by the prerogative of his office.  We, on the contrary, contend that he has no such exemption, and that he is as amenable to the process of the law as the humblest citizen.  Story, the ablest commentator on the constitution, does not claim for the President any privilege from arrest except on civil process.  *2nd Story, Com. on Const.* 419.

It is singular that in order to ascertain the powers or privileges of the Governor of a free republic, we should see a resort to the powers and privileges of a crowned head.  Yet this is undeniably the case here.  If the Governor cannot be punished for a contempt, it must be, either because he is exempted by some provision of the constitution, or because it would be inconsistent with the nature of his office.  The nature of his office, we contend, is to be ascertained exclusively by reference to the provisions of the constitution.  If there are other means of ascertaining its nature, it must be by assimilating it to the executive office elsewhere.  And that this elsewhere is England, is apparent from the whole tenor of the argument.

The gentleman avers that this court did not in the case of Taylor, decide and settle this question.  It is true that the question was not raised; but we contend that as it was a question of jurisdiction, this court did, in that case, when they went on to decide on the merits of

LITTLE
ROCK,
Jan'y 1839

HAWKINS
vs
THE GOV-
ERNOR.

Taylor's motion, and upon his claims to the office of sheriff, decide that they had the power to issue the mandamus to the Governor. If they had not the power, if they had no jurisdiction, they decided against Taylor's right to the office without having the right to decide, and are justly obnoxious to the same charge brought by the gentleman against Chief Justice Marshall.

It is not necessary to plead a question of jurisdiction like this. The court will notice it in any stage of the proceedings. Can it be imagined that in the case of Taylor, they proceeded to decide that he had forfeited his right to be elected sheriff, when, if they had decided for him, they could have afforded him no relief? To give a decision *against* Taylor, upon the merits, was to decide that the court could have relieved him by mandamus; if his case had been such as to warrant his claiming the office. Most assuredly the applicant in this case was warranted by that decision in concluding that the court here had decided that they would issue a mandamus to the Governor, and in making this application.

LACY, *Judge*, delivered the opinion of the court:

This a motion for a rule against the Governor of the State, to show cause, if any he has, why a peremptory mandamus should not issue, commanding him to make out and deliver to *Richard C. Hawkins*, his commission to the office of Commissioner of Public Buildings.

The application was made during the present session of the Supreme Court, and is founded upon a petition regularly sworn to, and other exhibits filed in the cause.

The applicant claims to be duly elected by a majority of all the votes of both houses of the General Assembly. The petition states that upon the 17th day of November, 1838, the applicant transmitted to the Governor of the State the certificate of the Speaker of the House of Representatives, and of the President of the Senate, officially notifying him of his election to fill the office of commissioner of of public buildings, and at the same time he addressed a letter to his Excellency, requesting him to grant the commission, which he was entitled to by law.

The Governor replied to the communication, refusing to issue the commission upon the ground, that at the time the election was held, there was no law in force authorizing the legislature to hold an election for the commissioner of public buildings. Copies of the corre-

pondence are attached to the petition, and from the letters of the LITTLE ROCK, applicant and the executive, it appears that the requisitions of the Jan'y 1839 Statute, prescribing the manner of certifying the election to the HAWKINS Governor, were fully complied with on the part of the petitioner, and *vs.* THE GOV. that the Governor withheld the commission under the belief that the ERNOR. election was illegal and invalid.

It is contended in behalf of the motion, that the law creating the office of commissioner, was in force from and after the time of its passage; and as the applicant has shown by virtue of his certificate of election that he has a vested right to the commission, the executive has no power or authority to withhold it.

The applicant's right is founded or originates under an act of the legislature, approved March 3, 1838, which declares, " that there shall be elected by the General Assembly a commissioner of public buildings."

That the commissioner so appointed shall be commissioned by the Governor, and shall hold his office for two years, and receive one thousand dollars per annum, in full compensation for all his services.— See *Pamphlet Act of the Legislature*, 1837, p. 84.

The first question, then, submitted for our consideration and decision, is, has the Supreme Court jurisdiction of the case? or is the Governor of the State such an officer, to whom the writ may be properly directed, upon legal or constitutional principles?

Should the question be answered in the affirmative, then it will become necessary for the court to determine the validity of the election of the commissioner. But should it be answered in the negative, it will be wholly useless to prosecute the enquiry farther; for if the court does not possess jurisdiction to try the cause, and award the writ, they can pronounce no valid judgment concerning the election.

The peculiar, constitutional delicacy and importance of this question, require of this court a full and complete exposition of the principles upon which this opinion is founded.

These principles enter into the composition of civil government itself, and vitally concern the balance of power established by the constitution.

It is contended that the case of *Taylor* vs. *The Governor*, decided by this court, and reported *ante p.* 21, fully settles the question of jurisdiction of the Supreme Court to award a mandamus against the chief executive of the State, compelling him to issue a commission

LITTLE ROCK, Jan'y 1839

HAWKINS vs. THE GOVERNOR.

whenever it appears that he has improperly withheld it. It certainly never was the intention or the design of this court to decide in that case, or in any other, that they had power to issue a mandamus against the Governor of the State, to compel him to perform his legal or constitutional duties; neither will the facts or circumstances of that case, or the reasoning upon which the court proceeded, justify any such conclusion. It is freely admitted that it would have been more appropriate and judicial for this court to have met, and to have decided the question of jurisdiction in the first instance. But they felt then as they do now the difficulty and delicacy of such an enquiry; and therefore they agreed to waive the question of jurisdiction, leaving it to be determined upon some future occasion, should a case ever arise indispensably calling for its decision. In the case of *Taylor* vs. *The Governor*, the applicant clearly proved by his own showing, that he was expressly disqualified and ineligible by the constitution from holding the office of sheriff; and therefore he had no shadow or pretext of right to the commission which he demanded. This being the case, the court could see no indispensable duty or necessity devolving upon them to look into, and decide the question of jurisdiction; for whether they possessed jurisdiction or not, it was perfectly manifest that the applicant was entitled to no redress, because, from his own showing, it was positively certain he had suffered no injury. The power of the Supreme Court to issue a mandamus, as stated in the case referred to, is made to depend and turn exclusively upon the express language of the constitution; and certainly that instrument no where countenances the doctrine, that the writ can be legally or constitutionally directed to the Executive. The case of *Taylor* vs. *The Governor* is, then, no authority upon the subject; for it only settles the principle that under our form of government a mandamus was a constitutional writ, secured to the citizen, which the Supreme Court was bound to issue upon a case properly made out, when the party applying for it, had shown that he had a specific, legal right, and no other adequate, specific, legal remedy. The court fully recognize the truth and importance of these principles; but they certainly do not show that the writ can issue against the executive in any possible or conceivable case.

It has been urged with much earnestness that the case of *Marbury* vs. *Madison*, 1 *Cranch*, 166, clearly establishes the jurisdiction contended for. A brief recapitulation of the facts and principles of that case, will test the truth of this position. William Marbury, with

others, was appointed a justice of the peace for the District of Colum- bia by President Adams, near the close of his administration, by and with the advice and consent of the Senate of the United States.

The commission was regularly signed by the President, and delivered to the Secretary of State, to be recorded. The Secretary refused to deliver the commission, and Marbury applied to the Supreme Court of the United States for a mandamus to compel him to deliver it, or to give him a copy from the record of his office.

The case produced no ordinary degree of interest or excitement, for it was regarded as involving questions of a high political character, and which no tribunal could decide without exposing itself to unmerited criticism and censure. No cause was probably ever more deliberately considered and examined, and none, in the opinion of this court, rests upon higher or more unshaken principles of constitutional law, or of legal duty. Many points were raised and discussed at the bar, and were decided by the court, which were not necessarily put in issue by the proceedings.

The opinion, then, in that justly celebrated case, may be deemed in some respects as extra judicial. But this court does not on that account regard it as less authoritative or binding. The case finally went off for want of jurisdiction in the Supreme Court to issue the writ. The act of Congress giving jurisdiction to that tribunal to award a mandamus, was declared unconstitutional; because it was inconsistent with that provision of the instrument, which defines and limits the original jurisdiction of the Supreme Court to a particular class of cases.

It will be seen from the facts above stated, that the application in the case of *Marbury* vs. *Madison* was for a mandamus to issue to the Secretary of State, and not to the President of the United States. So far as this case can be considered as authority at all, it goes to disprove the position that the writ can legally be directed to the executive of the State. An attentive consideration of the principles laid down by the Chief Justice in delivering the opinion, raises a strong inference, which almost amounts to positive proof, that the chief executive of the State, under the form of our government, is such an officer as can in no manner be held responsible to the judiciary for the exercise of his legal or constitutional discretion. It will be borne in mind that the office of President of the United States, and the office of Governor of our State, are in many respects like each other, with this

oo

LITTLE
ROCK,
Jan'y 1839

HAWKINS
vs.
THE GOV-
ERNOR.

essential difference, that the former is entrusted with the executive powers that relate exclusively to the General Government, and the latter is entrusted with the exclusive powers that belong to the State Government. The powers conferred, and the duties enjoined upon both of these officers by the respective constitutions of the two governments, are in most particulars identically the same, so far at least as regards their legal or constitutional discretion.

It is stated in the case of *Marbury* vs. *Madison*, " that the President is invested with certain important, political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." " To aid him in the performance of these duties, he is authorized to appoint certain officers who act by his authority, and in conformity with his orders." " In such cases their acts are his acts, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist no power that can control that discretion. The subjects are political; they respect the nation, not individual rights; and being entrusted to the executive, the decision of the executive is conclusive."

If this is true in regard to the President, does not the same reasoning apply with equal force to the executive of the State? If there exists no power to control the will of the President in the exercise of his discretion, is not the executive of the State equally exempt from all control, except in the manner pointed out in the constitution. If all the powers and duties of the President are political, and concern the nation, and not individual rights, and if his decision is final and conclusive in regard to all constitutional or legal questions submitted to his judgment, so far as regards the performance of his own duty, are not the powers and duties of the executive of the State equally political? and do they not concern the State in her political capacity, and not individual rights? And is not his decision upon all legal, constitutional questions equally final and conclusive, so far as regards the performance of his own duties? If one of these positions be true, it necessarily follows that the other cannot be erroneous. Then the Governor of the State is not amenable to the judiciary for the manner in which he performs, or for his failure to perform, his legal or constitutional duties. His acts being political must of course be politically examined in the manner pointed out by the constitution. That instrument assigns to his office no ministerial acts to be performed, nor can the law enjoin upon him

any such duty. It is true, as contended, that when a specific duty is assigned by law, and individual rights depend upon the performance of that duty, "that the individual who considers himself injured has a right 'o resort to the laws for redress."

The doctrine here stated applies to such officers as have no legal or constitutional discretion left them; and consequently so far they are considered as the mere organs of the law, and are amenable to it for their conduct. This being the case, they are never permitted, "to sport away the vested rights of individuals." All the officers of the government, except the President of the United States, and the Executives of the States, are liable to have their acts examined in a court of justice.

The President and the Executives, by the theory and practice of our peculiar systems of government, are exempted upon the ground of political necessity, and of public policy. In the exercise of their legal or constitutional discretion, they are alone accountable to their country in their political character, and to their own conscience, according to the modes and manner of their respective constitutions.

Whenever the head or officers of a department are the political or confidential agents of the executive, appointed merely to execute his will, it is clear that in such cases their acts are his acts; and whatever opinion may be entertained of the manner in which their discretion may be used, still there is no power in the courts to control that discretion; for if there was, then would the executive will be put under the control and government of the judicial department, which is clearly and expressly forbidden by the constitution.

The act of Congress in relation to issuing patents for land, makes it the duty of the President to grant a patent to the purchaser whenever he produces the necessary certificate required by law. Should the President fail to execute this duty, and should individual rights be prejudiced by his non-performance of this legal duty, could the Supreme Court of the United States award a mandamus commanding him to issue the patent? Certainly not. Should Congress pass any act imposing a certain, specific duty upon that officer, and should he refuse or fail to execute it, could he be compelled to perform it by any mandate of the court? Most assuredly he could not. By way of testing this principle, suppose he was required to commission an officer chosen or appointed by an act of Congress, would a mandamus lie, compelling him to grant the commission? Certainly not.

LITTLE
ROCK,
Jan'y 1839

HAWKINS
*vs.*
THE GOV-
ERNOR.

To give to the judiciary, power to award a mandamus against the President, compelling him to perform his legal or constitutional duties, would in effect destroy the political balance of the constitution, and thereby break down and destroy one of the three great departments of government.

A doctrine so extravagant and unconstitutional, it is clearly necessary for this court to disclaim. Still if the party was legally appointed to fill the office, he would surely have a constitutional right to the commission; for that is but the evidence of the office, and there is certainly a constitutional duty imposed upon the President to grant him the commision; for the instrument declares, "he shall commission all the officers of the United States." See *Constitution U. S. Sec.* 3, *Art.* 5. A declaration more peremptory and express than the clause in our constitution, which enacts, "that all the commissions shall be in the name and by the authority of the State of Arkansas, be sealed with the seal of the State, signed by the Governor, and tested by the Secretary of State." See *Constitution, Sec.* 13, *Art.* 5.

Had the Supreme Court of the United States possessed the jurisdiction in the case of *Marbury* vs. *Madison*, it is perfectly clear from the principles laid down in that decision, that they would have compelled the Secretary of State, by a mandamus, or some other legal process, to have delivered the commission, or to have furnished a copy of it. The acts of the Secretary were enjoined by law, and regarded by the court as strictly ministerial; and hence the withholding of the commission in such a case, was deemed a violation of the vested rights of the applicants. And in the case now under consideration, according the doctrine established by the Supreme Court of the United States, (which this court fully recognizes and believes,) had the Governor signed the commission of the present applicant, and affixed to it the seal of the State, and have placed it in the office of the Secretary of State to be attested and recorded by that officer; and should the Secretary of State, under such circumstances, have failed to do his duty, this court would have awarded a mandamus against him, and compelled him to attest and record the commission and deliver it, or to furnish a copy from the record of his office. Whenever the Governor has signed a commission, and affixed to it the seal of State, his legal or constitutional discretion may then be considered as having terminated, and he has then lost all power or control over the commission, and he never can lawfully reclaim or repossess it. The reason that

the court would compel the Secretary to attest and deliver the com-
mission, is, that the law gives him no discretion upon the subject, and
therefore his acts are strictly ministerial, and must be performed if
they violate the vested rights of any individual.   This principle does
not reach or affect the executive, for all his official rights or duties are
political; and consequently he is entrusted by the constitution with
discretionary power.

The possession of the original commission is not indispensably neces-
sary to authorize a person appointed to any office, to exercise the
duties of that office; for if that was the case, the loss of the commission
would lose the office, and "not only negligence, but accident, fraud, fire,
or theft, might deprive an individual of his office."   In such cases a
copy of the record from the office where the commission was directed to
be recorded or kept, would be to all intents and purposes equal to the
original.   The case then of *Marbury* vs. *Madison* has not directly or
indirectly decided any principle in favor of the present applicant's
motion for a mandamus.   The question now under consideration has
never, that we are aware of, been decided by any tribunal.   So far as
we are informed, the case now comes up for the first time for investiga-
tion and decision.   The very fact that it never has before been made
in any of the courts of the United States, causes a very high, if not a
conclusive presumption, that there has been no abuse of executive
discretion in withholding commissions, or that it never was imagined
by any one that the writ could be directed to the Chief Magistrate of
the State.

The solution of this question depends mainly upon the construction
to be given to the constitutional powers to be distributed among the
three separate and distinct departments of the government.   The
constitution is the supreme, paramount law of the land, and its will is
imperative and must be obeyed.   The constitution is nothing more or
less than the original and supreme will of the people, acting in con-
vention and organizing the government, and assigning to the different
departments their respective powers and duties.   Their powers and
duties are defined and limited; and, "that their limits may not be
mistaken or forgotten, the constitution is written;" and all public offi-
cers are required to take an oath of office to support it.

The invention of a free, limited, and written constitution, may be
justly said to have been a prodigy in the science of government, re-
vealed and established by the American Revolution.   Ours is a com-

LITTLE
ROCK,
Jan'y 1839

HAWKINS
*vs.*
THE GOV-
ERNOR.
pound system of republics. " The power surrendered by the people is first divided between the General and State Governments, and then the portion allotted to each, is subdivided among distinct and separate departments." This constitutes a double security for the rights of the people, and for the maintenance and protection of the respective governments. The General and State Governments mutually act upon and control each other, and at the same time each is invested with sufficient power to control the governed, and to control itself.

This wise and beautiful system may safely be pronounced the highest invention of the human judgment; for it enlists interest on the side of patriotism, and appoints each of the governments with their respective and separate departments, as so many sentinels to guard the rights of the constitution, and to watch over the liberty of people. The basis of these invaluable systems rests upon the division, separation, and partition of the public will among these departments of the government; and upon these justly constituted and well balanced powers depend all our hopes for the continuance of regulated liberty.

The concentration of all power, legislative, executive, and judicial, in the same hands, constitutes the very definition of tyranny, that is given by all the early friends and founders of our free institutions.

There can be no liberty, says Montesquieu, where the legislative and executive powers are united in the same person or body of magistracy; or if the power of judging be not separated from the legislative and executive powers. This is a political axiom established by the deliberate judgment of centuries, and confirmed by the universal experience of mankind. The American constitutions have therefore made those departments as independent, and as separate from each other, as the nature of the case would admit of, or as their necessary connexion or bond of union would allow. Each department is made sovereign and supreme within its own sphere, and is left in the full and free exercise of all the powers and rights respectively belonging to it.— Each is a co-ordinate and equal branch of the government, and they all represent the sovereign will of the people, as embodied in the constitution.

The constitution makes and ordains them all, and appoints each department to guard the sacred and invaluable rights established by that instrument. The constitution is then above all the departments of the government; for it creates and preserves them. The will of the people must be greater than that of their agents, or there can be

no constitutional liberty or independence. All the departments of the government unquestionably have the right of judging of the constitution, and interpreting it for themselves. But they judge under the responsibilities imposed in that instrument, and are answerable in the manner pointed out by it. The duties of each department are such as belong peculiarly to it, and the boundaries between their respective powers or jurisdictions are explicitly marked out and defined. For any one department to assume powers or exercise a jurisdiction properly belonging to any other department, is a gross and palpable violation of its own constitutional duty.

The legislature, then, can exercise no power which properly belongs to the judiciary, or the judiciary, any power that rightly belongs to the executive. The duty of the legislature is, to prescribe the rule of action for the State; that of the judiciary, to interpret that rule, or to expound the law; and that of the executive, to see that the laws are faithfully executed.

But each has the right to judge of the constitution for itself; for without the exercise of such a right, there would not be three equal and co-ordinate departments of the government; neither would the constitution be placed under or entrusted to their respective guardianship and care. It is however the peculiar province and duty of this court to interpret and decide upon the laws and the constitution in the last resort. If two laws are opposed to each other, the court must determine which shall govern; so if the constitution and a statute stand in irreconcilable variance. Those whose duty it is to interpret the rule of action, must be of necessity left free to declare what that rule is, or we deprive the judiciary of the power of judgment and will, which are all the sovereign attributes they possess.

The constitution regards the judiciary as the final arbiter and interpreter of its will, and its language is in many instances directly addressed to the courts. It would be wholly impossible, without the agency or action of the courts, to preserve inviolate the rights of personal liberty, or of private property. How could the equality of taxation, the freedom of the press, liberty of conscience, the right of trial by jury, the writ of habeas corpus, or the sacred inviolability of the obligation of contracts, have been vindicated or maintained, unless the courts, whenever they were assailed by the legislature or executive encroachments, had interposed their authority and arrested the usurpation? It is their exposition and illustration of these principles and

LITTLE
ROCK;
Jan'y 1839

HAWKINS
*vs.*
THE GOV.
ERNOR.

rights, that have taught the citizen in times of danger and commotion to look to that tribunal for safety and protection.

It is the duty of the judiciary, however, to judge, and in their judgments courts should be careful to not overstep the boundaries of their powers. To allow the judiciary to exercise powers not conferred upon it by the constitution, would have a tendency to draw to it all the powers of the government, and thereby to overthrow the balance of the constitution. Such a jurisdiction has, however, never been attempted, and probably never will be under our forms of government.

Liberty has nothing to fear from the judiciary, but every thing to hope. Neither the purse nor the sword is entrusted to it; nor does it possess any power or patronage to render it popular or dangerous.—— Its only attributes are will and judgment, and these it cannot carry into execution without executive aid, or, in other words, without trusting to the moral and intellectual sense of the community to enforce its orders, judgments, and decrees. See *The Federalist*, 270, 275, 421, 422, 423, 424, *Washington's Correspondence.*

The legislative, executive, and judicial departments, are all responsible for an abuse or usurpation of power in the mode pointed out by the constitution. The constitution presupposes that they will all perform the duties enjoined upon them, and that they will not transcend the authority with which they are clothed. They are all jointly made to represent the sovereign will, and they are made responsible to that will, whenever they fail to perform that duty. Should the legislature pass an unconstitutional act, in moments of forgetfulness and ambition, it is not only the right, but the duty of the executive to arrest it, and return the bill to the House from which it emanated. Time for reflection is thus given to the popular branch of the Government to pause and to reconsider the measure. But should they, notwithstanding the objections of the executive, still be determined to pass the act, it cannot however generally be put into operation, except by means of the judiciary; and hence, if the act violates any constitutional guarantee or vested right, the court is bound to declare it null and void, and of course the law cannot be executed. The evil or abuse of any power is capable of being remedied by means of the elective franchise. Responsibility and representation are so intimately connected and blended with each other, that they cannot be separated and disconnected without political injury and detriment. Should the judiciary corruptly assume powers not belonging to that department, or

should they, from interested motives, and for wicked and nefarious pur-
poses, refuse to exercise powers expressly enjoined by the constitution,
then the judges are liable to an impeachment for malpractice or mis-
demeanor in office, and for reasonable cause, which does not furnish
sufficient ground for impeachment, the Governor may, upon the joint
address of two thirds of both Houses of the legislature, remove them
from office.  The judges are then held responsible to the people
through the legislature in two ways:  First, by impeachment for mal-
practice or misdemeanor in office; and, secondly, by address for any
gross, flagrant, and palpable impropriety of official conduct, not amount-
ing to corruption.  In case the executive should prove unfaithful in
the discharge of his legal or constitutional duties, he likewise may
be held responsible to the people for malpractice or misdemeanor in
office.  Besides, he is amenable to the same tribunal, through the
agency of the elective franchise.  Thus it will be seen that the con-
stitution places him in a double responsibility:  First, the responsibility
of the right of suffrage; and lastly, that of impeachment.  He is only
answerable in one or both of these ways, for his official conduct, while
he continues in the exercise of his office.  These are the only res-
trictions placed upon his discretion, and to them the people confided
their rights and interests.  To make him accountable in any other
way, would be to create a responsibility unknown to the constitution,
and in violation of its authority.  It would be doing more, for it would
destroy his legal and constitutional discretion, by an accumulation of
undue power in the same hands, and thus it would annihilate a co-
ordinate and independent part of the government.

It is no answer to this argument to say, that he may exercise his legal
and constitutional duties in such a manner that individual injustice
may be done without remedy or redress.  So may the other depart-
ments.  The convention, in forming and organizing the government,
did not think so, or they would have placed some additional security
around individual rights.  They proceeded upon the principle that all
the departments would do their duty.  If in this they should be mis-
taken, they have provided an efficient remedy for every abuse of a
political nature, and that remedy is in the hands of the people, and,
we are bound to presume, will be properly used: otherwise, we are
compelled to abandon all rational hope of the stability and continu-
ance of our free institutions.

The legislature have made the General Assembly the judges of the

PP

LITTLE ROCK,
Jan'y 1839

HAWKINS
*vs.*
THE GOV-
ERNOR.

qualifications, returns, and elections of their own members. They are required to keep a record of their acts, and to publish a journal of their proceedings, except such parts as may, in their opinion, require secrecy. No person shall be a member of the House of Representatives who shall not have attained the age of twenty-five years, and no person shall be a Senator who shall not have attained the age of thirty years. No person who is a public defaulter shall be eligible to a seat in either House of the General Assembly, nor shall hold any other office of profit or trust; nor shall any person convicted of any infamous crime be eligible to a seat in either House of the General Assembly.

Suppose the people should return a member to the Senate or the House of Representatives, who had not attained the requisite age, or who was a public defaulter, or who had been convicted of some infamous crime, to whom would the right belong to judge of his disqualification? To the judiciary, or to the legislature? Most assuredly to the latter; for to them the constitution has confided the right of judging, which implies the free exercise of discretion in such cases.

Suppose the legislature should refuse to record their proceedings, or to publish a journal of them, could the court issue a mandamus compelling them to perform their legal, constitutional duties? Most assurredly they could not; for in such cases, the whole matter is left to the discretion of the legislature; and that discretion is not subject to the government or control of the judiciary. A moment's examination of the structure and character of the executive department, will be sufficient to satisfy any one that all his legal or constitutional duties are political, and that he is only accountable for them to his country, and to his own conscience, in a political manner. The following enumeration includes most of his constitutional duties: He is required to issue writs of election to fill all vacancies that occur in either House of the General Assembly; he is made the commander in chief of the army and militia of the State, except when they are called into the service of the United States; he may, by proclamation on extraordinary occasions, convene the General Assembly, and in case of disagreement between the Houses, he may adjourn them until such time as he thinks proper, provided it be not beyond the day of the next meeting of the General Assembly; he is required to keep the seal of the State in his office, and to use it officially, and to sign all commissions, and have them attested by the Secretary of State; it is his duty

to give to the General Assembly information of the state of public LITTLE ROCK, Jan'y 1839. affairs, and recommend to their consideration such measures as he deems expedient; and see that the laws are faithfully executed.

HAWKINS
vs.
THE GOV-
ERNOR.

It will certainly be conceded that all the duties here enjoined upon the executive are strictly and exclusively political, except the granting of commissions; and if that is not a political duty, why is it inserted among other political obligations? or what reason is there for excepting it out of the general principle.

It is possible that individual injustice may be, and generally is produced by the non-performance of any one, or all of these duties; but it may be fairly presumed that it will not more frequently occur, in refusing to grant commissions, than in the other enumerated cases. Besides, if the court can issue a mandamus to compel him to grant a commission which he improperly, or from a mistaken sense of duty, withholds, why may they not award a process against him to issue writs of election, or to convene the legislature or adjourn it? If the writ can be legally directed to him in the first case, it certainly may in the latter; for they both rest upon the same principle, and may be attended with the same injury. It certainly cannot be pretended that the judiciary can compel him to assume the command of the army or militia, when they are called into the service of the state, or that it can command him to give information to the General Assembly, or that it can command him to see that the laws are faithfully executed. In all of these cases, he certainly possesses a political discretion, for the use of which he is alone answerable to his country. Why then is his discretion taken away or destroyed when his duty concerns the issuing of a commission? It certainly is not. His duty is as clearly political in that case, as in any of the other enumerations; and if the court have jurisdiction in that instance to prescribe the rule of his conduct, by a parity of reasoning they certainly possess it in regard to all the other cases. This would make the judges the interpreters, not only of the will of the executive, but of his conscience and reason; and his oath of office, upon such a supposition, would then be both a mockery and a delusion. See *Article V, Executive Department.*

Again the executive is bound to see that the laws are faithfully executed; and he has taken an oath of office to support the constitution. How can he perform this duty, if he has no discretion left him in regard to granting commissions? For should the legislature appoint a person constitutionally ineligible to hold any office of profit or trust,

LITTLE
ROCK,
Jan'y 1839
HAWKINS
*vs.*
THE GOV-
ERNOR.

would the executive be bound to commission him? and that too when his ineligibility was clearly and positively proven? In such case, the exercise of his discretion must be admitted, or you make him, not the guardian, but the violator of the constitution. What, then, becomes of his oath of office?

If he has a legal, constitutional discretion in such a case, why is he divested of his judgment and reason, in regard to the legality of the election depending upon other principles, but which are as clear to his mind, and as binding upon his conscience? The analysis of his duties then, clearly proves that he is in no way amenable to the judiciary for the manner in which he shall exercise or discharge these duties. His responsibility rests with the people, and with the legislature. If he does an unconstitutional act, the judicary can annul it, and thereby assert and maintain the vested rights of the citizen. The writ asked for, however, does not proceed upon the ground that the Governor has done any illegal or unconstitutional act, but that he has refused to perform a legal or constitutional duty. In the first case, the court certainly has jurisdiction; and in the last, they unquestionably have not. The court can no more interfere with executive discretion, than the legislature or executive can with judicial discretion. The constitution marks the boundaries between the respective powers of the several departments, and to obliterate its limits would produce such a conflict of jurisdiction as would inevitably destroy our whole political fabric, and with it the principles of civil liberty itself. It would be an express violation of the constitution, which declares upon its face, "that there shall be three separate and independent departments of government, and that no person or persons, being of one of these departments, shall exercise any power belonging to either of the others." See *Constitution, Article II, Section 2.* This being the case, it is clearly demonstrable that the court has no jurisdiction of the cause now under consideration, and they have no power to award a mandamus to the Governor to compel him to grant the commission. The motion must, therefore, be dismissed for want of jurisdiction.

As the court is shown to have no jurisdiction in the case, it would be irregular and improper to proceed to deliver any judgment in regard to the legality of the election to the office of commissioner of public buildings.