The State, *ex rel.* Jameson *et al., v* Denny, Mayor.

Filed April 23, 1889.

No. 14,837.

THE STATE, EX REL. JAMESON ET AL., *v.* DENNY, MAYOR.

CONSTITUTIONAL LAW.—*Appointment to Office.—Power of Legislature.*—The appointment to an office which is in no manner connected with the discharge of legislative duties, involves the exercise of executive functions, and is prohibited to the Legslature by section 1 of article 3 of the Constitution, except in so far as the power of appointment is reserved to it by section 1 of article 15.

SAME.—*Construction of ·Constitutional Provision.*—The provision of section 1 of article 15 that "All officers whose appointment is not otherwise provided for in this Constitution shall be chosen in such manner as now is, or hereafter may be, prescribed by law," is to be construed in the light of the laws in force at the time the Constitution was adopted, and seems to limit the power of the Legislature to such appointments as it might make under those laws.

SAME.—*Manner of Making Appointment.— Power to Provide for.*—The power to provide by law the *manner* or *mode* of making an appointment to a new office created by the Legislature does not include the power to make the appointment itself.

SAME.—*Legislature may not Appoint Local Officers.*—The Legislature has no power under the Constitution to appoint local municipal officers.

SAME.— *Local Self-Government. — Right of the People.*—The right of the people to govern themselves, as to matters which are purely local, through the medium of local municipal governments and officers chosen by them-

selves, was not surrendered upon the adoption of the Constitution, but is still vested in them, and it can not be taken away by the Legislature.

SAME.—*Cities.*—*Public Works.*—*Legislative Interference.*—*Invalid Act.*—The act of March 8th, 1889 (Acts of 1889, p. 247), assuming to give the exclusive control of streets, alleys, sewers, lights, water supply, etc., in cities of more than fifty thousand inhabitants, to boards of public works to be chosen by the Legislature from residents of the cities affected, is void, as denying the right of local self-government.

MITCHELL, J., dissents.

From the Marion Superior Court.

*J. S. Duncan* and *C. W. Smith,* for appellants.

*L. T. Michener,* Attorney General, *W. L. Taylor, A. C. Harris, W. H. Calkins, F. Winter, R. O. Hawkins, C. F. Griffin* and *J. H. Gillett,* for appellee.

COFFEY, J.—On the 9th day of March, 1889, there was filed in the office of the secretary of state what purports to be an act of the General Assembly of the State of Indiana, entitled "An act to establish an efficient board of public works and affairs in all cities of fifty thousand inhabitants or more; providing for the manner of the selection of the members of the board hereby created, and defining their duties, and providing for the selection of their successors; providing for the taking control of and having exclusive power over the construction, supervision, cleaning, repairing, grading and improving all streets, alleys, and highways of every kind and description, and the building of sewers, culverts, bridges, sidewalks and curbing of all streets and alleys; and providing for the abolishment of existing boards of public improvements in such cities; providing for the making of contracts for the lighting of all streets, alleys, public buildings, and public places within such city, and providing for the making of all contracts for the supply of water for all purposes of whatever kind for such city; and abolishing all boards on lights, water-works, and supplies; and providing for the appointment of a legal adviser, a city civil engineer, and superintendent of streets, and repealing so much of section eight (8) of an act entitled 'An act to re-

peal all general laws now in force for the incorporation of cities, and to provide for the incorporation of cities, prescribing their powers and rights and the manner in which they shall exercise the same, and to regulate such other matters as properly pertain thereto,' approved March 14th, 1867, and amended March 6th, 1877, the same being section three thousand and forty-three (3043) of the Revised Statutes of 1881, as is in conflict with this act; and repealing all laws in conflict herewith, and declaring an emergency." Acts of 1889, p. 247.

The act provides for the establishment, in all cities in this State containing a population of fifty thousand inhabitants or more, of a board of public works and affairs, to consist of three members, selected from the two leading political parties, one member of said board to hold his office for the period of two years from the date of his selection, and the other two members are to hold their office for the period of four years.

The members of such board must have been freeholders of the city at least one year prior to their election, and must have been *bona fide* residents of the city at least five years. Each member of such board is required to execute a bond in the sum of $20,000, to the approval of the mayor of the city, for the faithful performance of the duties of his office.

The act abolishes all existing boards of public improvements and the office of street commissioner, and confers on the board of public works and affairs thereby created the power to perform all the duties heretofore conferred upon such boards of public improvements and street commissioner. It also gives such board of public works and affairs full power to construct all streets, alleys, avenues, bridges, sewers, drains, ditches, culverts, sidewalks and curbing, and to take charge of the cleaning, repairing, grading and improving of the same, and to make all contracts for the furnishing of lights for the streets, public buildings and public places in the city, and for furnishing water for the city for every purpose. It

has the exclusive power to employ such superintendents, laborers or other persons as it may deem necessary for the execution of its business, and fix their salaries and compensation.

By the terms of said act the board of public works and affairs is to have the exclusive power and control over the construction, supervision, cleaning, repairing, grading and improving all streets, alleys, avenues, lanes, bridges, drains, culverts, sidewalks and curbing, and the lighting of such public places as may be deemed necessary in such city, and to fix and establish the grades of all streets and alleys, avenues and thoroughfares. It may order and construct the improvement of any street, alley or thoroughfare in the city where a majority of the property-owners affected thereby do not remonstrate.

It has the exclusive power to make all improvements and expenditures. Such board is entitled to possession of all property belonging to the city, used for the purposes named in the act, and it is made the duty of the common council to provide for the payment, out of the city treasury, of all the expenses incurred by the board of public works and affairs.

The act makes it a criminal offence for any person to interfere, in any manner, with said board or its employees in the discharge of their respective duties. It also makes it the duty of the General Assembly of the State to elect the board of public works and affairs, by a joint vote of a majority thereof, and it is made the duty of the speaker of the house and the secretary of the senate to certify such election. In case of a vacancy in such board, it is made the duty of the mayor of such city to fill the same by appointment.

Pursuant to the terms of this act, the appellants were elected by the General Assembly of the State of Indiana as members of the board of public works and affairs for the city of Indianapolis, prepared the bonds therein required and tendered the same to the appellee, as the mayor of said city,

for his approval. The appellee, as such mayor, declined to approve said bonds, and this action was brought, in the superior court of Marion county, to compel him, by mandate, to discharge that duty. The rulings of said court being adverse to the appellants, they appeal to this court and assign error.

It is conceded that if the act in question is a valid and binding law, and that the appellants were legally elected, the judgment of the court below must be reversed.

Admitting for the time being that the act in question is otherwise valid, it is insisted that, under our Constitution, the General Assembly had no power to elect or appoint the appellants, and that so much of the act as attempts to confer on it such power is in conflict with the Constitution, and is, therefore, void.

It is claimed that the appointment to an office is an executive function, and that by the terms of our Constitution the General Assembly is prohibited from filling an office created by it, unless such office is connected with the duties imposed upon it as a legislative body. This contention arises out of the provisions of section 1, article 3 of the Constitution, which is as follows: "The powers of the government are divided into three separate departments; the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided."

In the case of *Wright* v. *Defrees*, 8 Ind. 298, it was said by this court that "The powers of the three departments are not merely equal,—they are exclusive, in respect to the duties assigned to each. They are absolutely independent of each other."

In the case of *Lafayette, etc., R. R. Co.* v. *Geiger*, 34 Ind. 185, this court, in speaking of the above constitutional provision, says: "The same division of powers exists in the Federal Constitution, and in most, if not all, of the State

Constitutions, and is essential to the maintenance of a republican form of government. These departments of government are equal, coördinate, and independent. The duties imposed on each are separable and distinct, and it is expressly provided, that ' no person, charged with official duties under one of these departments, shall exercise any of the functions of another.' The persons charged with the execution of these powers are alike elected by, and are responsible to, the people, in whom resides the sovereignty of the State. This division of power prevents the concentration of power in the hands of one person or one class of persons." The same language is used substantially in *Smith* v. *Myers,* 109 Ind. 1 ; *State* v. *Governor,* 1 Dutch. 331 ; *Ex Parte Dennett,* 32 Me. 508 ; *Low* v. *Towns,* 8 Ga. 360 ; *Mauran* v. *Smith,* 8 R. I. 192 ; *Hawkins* v. *Governor,* 1 Ark. 570 ; *Houston, etc., R. W. Co.,* v. *Randolph,* 24 Texas, 317 ; *People* v. *Bissell,* 19 Ill. 229 ; *Dickey* v. *Reed,* 78 Ill. 261 ; *Rice* v. *Austin,* 19 Minn. 103 ; *Western R. R. Co.* v. *De Graff,* 27 Minn. 1 ; *Secombe* v. *Kittleson,* 29 Minn. 555 ; *Sill* v. *Village of Corning,* 15 N. Y. 297 ; *People* v. *Albertson,* 55 N. Y. 50 ; Cooley Const. Lim., star pp. 87, 88, 93, 114, 175 ; Sedgw. Const. & Statute Constr. (2d ed.) 132, 138, 184.

Legislative power is the power to make, alter and repeal laws, and is vested in the General Assembly. *Lafayette, etc., R. R. Co.* v. *Geiger, supra.*

Cooley, in his Constitutional Limitations, page 90, says : " The legislative power we understand to be the authority, under the Constitution, to make laws, and to alter and repeal them. Laws, in the sense in which the word is here employed, are rules of civil conduct, or statutes, which the legislative will has prescribed." See, also, *Greenough* v. *Greenough,* 11 Pa. St. 489 ; *Wayman* v. *Southard,* 10 Wheat. 1.

In the convention which framed our Constitution, Mr. Biddle, a member, in addressing the convention, said : " The General Assembly has no other duty nor *power* than to *make* laws. After a law has been enacted this department has no

further power over the subject. It can neither adjudge the law, nor execute it, but must leave it upon the statute books, and for any function still remaining in the legislative power, there it would forever remain. All the power of this department here ends." 2 Constitutional Debates, 1324.

Judicial power is the power to construe and interpret the Constitution and the laws, and make decrees determining controversies, and is vested in the courts.

The executive power is the power to execute the laws, and is vested in the Governor of the State, the administrative officers of the State, counties, townships, towns and cities. Then, to which one of these departments does the appointment to office belong ?

If the General Assembly should create an office, by statute duly passed by it, providing that it should be filled by appointment, the act of filling such office is a partial execution of the law.

Webster defines executive—qualifying for, or pertaining to the execution of the laws, as executive power or authority, executive duties. " In government *executive* is distinguished from *legislative* and *judicial*, legislative being applied to the organ or organs of government which makes the laws; judicial to that which interprets and applies the laws; executive to that which carries them into effect."

Mr. Jefferson, in a letter to Samuel Kercheval, dated July 16th, 1816, said: " Nomination to office is an executive function. To give it to the Legislature, as we do (in Virginia), is a violation of the principle of division of powers. It swerves the members from correctness, by tempting them to intrigue for offices themselves, and to corruptly barter for votes, and destroys responsibility by dividing it among a multitude."

Mr. Holman, a member of the constitutional convention, in addressing it, said that it was not the intention to confer the appointing power upon the General Assembly, except as to two or three officers. 2 Constitutional Debates, 1238.

Generally, then, the appointment to an office is an executive function. It must be conceded, however, that it is not every appointment to office which involves the exercise of executive functions, as, for instance, the appointments made by judicial officers in the discharge of their official duties, or the appointments made by the General Assembly of officers necessary to enable it to properly discharge its duties as an independent legislative body, and the like. Such appointments by the several departments of the State government are necessary to enable them to maintain their independent existence, and do not involve an encroachment upon the functions of any other branch. But the appointment to an office like the one involved here, where it is in no manner connected with the discharge of legislative duties, we think involves the exercise of executive functions and falls within the prohibition of section 1, article 3 of the Constitution. It is believed that the Constitutions of a large majority of the States in the Union contain an express provision prohibiting the General Assembly from appointing officers not connected with their legislative duties. A like prohibition is contained in our Constitution, except in cases where it is expressly provided that they may appoint. As the Legislature of our State is prohibited from appointing to office except as in the Constitution expressly provided, it remains to inquire whether there is any express provision giving it the right to appoint the appellants to the office which they now claim. And in making this inquiry it is necessary to consider our Constitution as a whole. No lawyer who desired to ascertain the intent of the framers of that instrument would undertake to do so by considering it in detached portions. When considered and construed as a whole, it is impossible to avoid the conclusion that those who framed it intended to deprive the Legislature of all appointing power. Frequent reference is made to offices the appointment to which is vested in the General Assembly. Section 18, arti-

cle 5, is as follows: "When, during a recess of the General Assembly, a vacancy shall happen in any office, the appointment to which is *vested in the General Assembly;* or when, at any time, a vacancy shall have occurred in any other State office, or in the office of judge of any court, the Governor shall fill such vacancy by appointment, which shall expire when a successor shall have been elected and qualified." Here is an express recognition of the fact that the General Assembly is vested with the power to appoint to some office, and from the language used, the strong inference is that it is a State office. But no power to make such appointment is conferred by the provisions of this section, and, if such power exists, we must look elsewhere to find it.

Section 1, article 15, is as follows: "All officers whose appointments are not otherwise provided for in this Constitution shall be chosen in such manner as now is, or hereafter may be, prescribed by law."

This provision is evidently to be construed in the light of the laws in force at the time of its adoption. We think it would be impossible to ascertain its meaning in any other way. Other sections of the Constitution make provision for appointments by the Governor and for certain appointments by the General Assembly, but there was still a large number of officers created by law for whose appointment no provision had been made. In view of this fact section 1, article 15, was inserted, providing that such officers should be appointed in such manner as then was, or as should thereafter be, prescribed by law. It is disclosed by an examination of the laws then in force, that the manner of appointing, or electing, State librarian, State printer, warden of the State prison at Jeffersonville, commissioners of the insane asylum, and, perhaps, some other officers, for whose appointment no provision is made in the Constitution, were elected or appointed by joint ballot of the two Houses of the General Assembly. This, at the time of the adoption of the Consti-

tution, was the manner prescribed by law for their appointment. This section provides that they shall continue to be so appointed unless a different mode is prescribed by law.

This construction harmonizes and gives force to all the provisions of the Constitution, while to wholly deny the General Assembly the power to make appointments renders meaningless many words, phrases, and even whole sentences found in that instrument.

It is not to be supposed that a single word was inserted in the organic law of the State without the intention of conveying thereby some meaning. While it is true that this section does not purport, on its face, to grant to the General Assembly any special power of appointing to office, it does, we think, when construed in connection with the laws to which it refers, reserve to it the power to appoint such officers as it then had the right to appoint by the laws then in force, unless a different provision was made by the Constitution. But does it follow that because this section confers on the General Assembly that power, it also has the right to create new offices and fill them, or to fill offices then in existence, the right to fill which was not at that time vested in it by law?

Other provisions of the Constitution confer on the General Assembly the right to create new offices, but they are silent as to the manner in which they shall be filled. It is true, they provide that they shall be filled in the manner prescribed by law, as does the last clause of section 1, article 15. It is argued that because this latter clause, as well as other provisions of the Constitution, confers on the General Assembly the power to prescribe the manner of election or appointment, it may, by law, reserve the right of appointment to itself. It is obvious, however, that there is a broad distinction between providing the mode or manner of doing a thing and doing the thing itself.

In the case of the *State* v. *Kennon*, 7 Ohio St. 546, 560, BRINKERHOFF, J., in discussing this question, says: " To

make good this claim, it must be made to appear that the power to direct the *manner*, the *mode*, the way in which an act shall be done, and the power and authority to do the act itself, are one and the same thing.    But that they are not identical, or equivalent to each other, is too clear for argument, and almost too clear to admit of illustration.    To prescribe the *manner* of election or appointment to an office is an ordinary legislative function.    To make an appointment to office is an administrative function.    And, under a Constitution in which the philosophical theory of a division of the powers of government into legislative, executive, and judicial, should be exactly carried out in detail, the power of prescribing the *manner* of making appointments to office would fall naturally and properly to the legislative department; while the power to make the appointments themselves would fall as naturally and properly to the executive department.    This exact adherence to theory, however, is seldom if ever found in any frame of government; and we refer to the distinction simply by way of reply to the claim, on behalf of the defendants, in argument, that the power to prescribe the *manner* of appointments includes the power of appointment itself, and to show that they are acts and powers wholly different and distinct from each other."

SWAN, J., in the same case, used the following language : " Upon this question, it seems to me only necessary to refer to the plain words of the Constitution.    It provides, in the first place, that ' the election and appointment of all officers, and the filling of all vacancies, not otherwise provided for by this Constitution or the Constitution of the United States, shall be made in such manner as may be directed by law.' Now, providing by law the manner in which an appointment shall be made, and the making of the appointment itself, are two different things : the first is pointing out the mode in which the thing shall be done, and the other is doing the thing itself; the one is legislative and directory, the other administrative."

We think it plain that the power to provide by law the *manner* or *mode* of making an appointment does not include the power to make the appointment itself. As has been said, by section 1, article 15, the General Assembly has the right to appoint such officers as it had the right by the law in force at the time of its adoption to select, and by the terms of that section it also has the right to prescribe by law the manner in which officers for whose appointment no provision is made in the Constitution shall be appointed. What, then, is the limit of the legislative power to appoint to offices created by statute, or is there any limit to such power? If there is no limit, then the General Assembly may appoint all the officers created by statute, from the attorney general of the State down to the smallest township officer, for they are all the creatures of the statute. It may appoint the board of county commissioners, the township trustees, county superintendents, and even road supervisors. It may create offices without limit and fill them with its own appointees.

In the light of the contemporaneous history of the Constitution, we do not think it will be seriously contended that the framers of that instrument intended to confer upon, or leave with, the General Assembly any such power. Where, then, is the limit? Whatever the limit may be, it is clear to us that it has no power to fill, by appointment, a local office like the one now under consideration. As the right to prescribe by law the manner of appointing to a new office created by the Legislature does not carry with it the right to make such appointment, we know of no provision in the Constitution under which such right can reasonably be asserted. It is believed that this conclusion accords with the practical construction heretofore placed upon our Constitution.

The first General Assembly to meet after the adoption of the Constitution claimed and exercised the right to appoint the officers which they had the right to appoint under the law in force at the date of its adoption, and for the appoint-

ment of which no provision had been made by the Constitution, while the other appointments have generally been conceded to the executive department of the State; but at no time in the history of the State has the General Assembly, until now, claimed or exercised the right to appoint local officers for a town or city.

In our opinion, so much of the act now under consideration as attempts to confer on the General Assembly the duty of appointing or electing to the office now claimed by the appellants, is in conflict with our Constitution, and is void. It seeks to confer on that body executive functions which it is prohibited from exercising.

This leads us to the consideration of the question as to whether the remaining portions of the act are constitutional. It is to be observed that the act takes away from cities having a population of fifty thousand inhabitants or more all control over the streets and alleys, lights and water supply, and transfers it to a board, in the selection of which the people of the city have practically no voice. It is claimed that inasmuch as it practically deprives the people of the power of local self-government, it is in conflict with our organic law, and is therefore void.

In passing upon this question it is necessary that we keep in mind the well established rules by which we are to determine the constitutionality or the unconstitutionality of a statute.

The power of the courts to declare a statute unconstitutional is a high one, and is very cautiously exercised, and is, in fact, never exercised in doubtful cases. *Robinson* v. *Schenck*, 102 Ind. 307. An act of the Legislature is not to be declared unconstitutional unless it is clearly, palpably and plainly in conflict with the Constitution. *Groesch* v. *State*, 42 Ind. 547.

Judge Cooley, in his able and valuable work on Constitutional Limitations (5th ed.), page 208, says: " It does not follow, however, that in every case the courts, before they

can set aside a law as invalid, must be able to find in the Constitution some specific inhibition which has been disregarded, or some express command which has been disobeyed. Prohibitions are only important where they are in the nature of exceptions to a general grant of power; and if the authority to do an act has not been granted by the sovereign to its representative, it can not be necessary to prohibit its being done."

With these reasonable and well established rules constantly in view, we proceed to examine the question of the constitutionality of the act now before us. In doing so it must be obvious to every one that the Constitution must be considered in the light of the local and State governments existing at the time of its adoption. Considered in any other light, many expressions found therein would be without meaning. That the principles of local self-government constitute a prominent feature in both the Federal and State governments is a fact not to be denied. It is recognized in Indiana in the Constitution of 1816 and in the Constitution of 1851. It is truthfully said by the learned judge who delivered the majority opinion in the superior court, " that it existed before the creation of any of our Constitutions, National and State, and all of them must be deemed to have been framed in reference to it, whether expressly recognized in them or not; indeed, it is recognized as the chief bulwark for the protection of the liberties of the people against too great centralization of power, either in executive or legislative departments of the State."

It is, perhaps, true that the General Assembly may, at will, pass laws regulating the government of towns and cities, taking from them powers which had previously been granted, or adding to that which had previously been given, but we do not think that it can take away from the people of a town or city rights which they possessed as citizens of the State before their incorporation. The object of granting to the people of a city municipal powers is to give them additional

rights and powers to better enable them to govern themselves, and not to take away any rights they possessed before such grant was made. It may be true, that as to such matters as the State has a peculiar interest in, different from that relating to other communities, it may, by proper legislative action, take control of such interests; but as to such matters as are purely local, and concern only the people of that community, they have the right to control them, subject only to the general laws of the State, which affect all the people of the State alike. The construction of sewers in a city, the supply of gas, water, fire protection, and many other matters that might be mentioned, are matters in which the local community alone is concerned, and in which the State has no special interest, more than it has in the health and prosperity of the people generally, and they are matters over which the people affected thereby have the exclusive control, and it can not, in our opinion, be taken away from them by the Legislature.

Municipal corporations are to be regarded in a two-fold character: the one public, as regards the State at large, in so far as they are its agents for government; the other private, in so far as they are to provide for the local necessities and conveniences for their own citizens; and as to the acquisitions they make in the latter capacity, as mere corporations, it is neither just nor is it within the power of the Legislature to take them away or to deprive the local community of the benefit of them. *People* v. *Hurlbut,* 24 Mich. 44. In the case above cited the learned judge who delivered the opinion said: "We must never forget, in studying its terms (the Constitution), that most of them had a settled meaning before its adoption. Instead of being the source of our laws and liberties, it is, in the main, no more than a recognition and re-enactment of an accepted system. The rights preserved are ancient rights, and the municipal bodies recognized in it, and required to be perpetuated, were already existing, with known elements and functions. They were not

towns or counties or cities or villages, in the abstract—or municipalities which had lost all their old liberties by central usurpation—but American and Michigan municipalities of common law origin, and having no less than common law franchises.  So far as any indication can be found, in the Constitution of 1850, that they were to be changed in any substantial way, the change indicated is in the direction of increased freedom of local action, and a decrease in the power of the State to interfere with local management."

Again, in the same opinion, this language is used : " Incorporated cities and boroughs have always, both in England and in America, been self-governing communities within such scope of jurisdiction as their charters vest in the corporate body.  According to the doctrine of the common law, a corporation aggregate for municipal purposes is nothing more nor less than ' investing the people of the place with the local government thereof.' (Salk. 193.) In the absence of any provision in the charter creating a representative common council, the whole body of freemen make the common council, and act for the corporation at their meetings.  It is agreed by historians that originally all boroughs acted in popular assembly, and that the select common council was an innovation, which may have been of convenience or by encroachment.  In modern times cities have generally acted in ordinary matters by such a select body. * * * But whether acting directly or by their representatives, the corporation is, in law, the community, and its acts are their acts, and its officers their officers.  The doctrine is elementary that all corporation officers must derive office from the corporation.  This has been from time immemorial settled law.  By articles 15 and 16 of the great charter, it was stipulated that the liberties and free customs of London and all other cities, boroughs, towns, and ports should be preserved.  Those liberties were all connected with and dependent upon the right to choose their own officers and regulate their own local concerns. * * * Our Constitution can not be understood or carried out at all, except on the

theory of local self-government; and the intention to preserve it is quite apparent. In every case where provision is made by the Constitution itself for local officers, they are selected by local action. All counties, towns, and school districts are made to depend upon it."

So the intention to preserve local self-government is apparent throughout the entire scope of our own Constitution. By section 2, article 6, county officers are to be elected by the people at the general elections. By section 3, article 6, such other county and township officers as may be necessary are to be elected or appointed in such manner as may be prescribed by law; and it is expressly provided, in clause 4 of the schedule to the Constitution, that "All acts of incorporation for municipal purposes shall continue in force under this Constitution until such time as the General Assembly shall, in its discretion, modify or repeal the same."

It is, therefore, perfectly apparent from the Constitution itself that it was framed with reference to then existing local governments of counties, towns, townships and cities. Did the people, then, in the adoption of the Constitution, surrender the right to local self-government which they at that time possessed?

Judge COOLEY, in the case above cited, said: " The State may mould local institutions according to its views of policy or expediency; but local government is matter of absolute right; and the State can not take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the State not only shaped its government, but at discretion sent in its agents to administer it; or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs, or no control at all." Two years later, in a reconsideration of the same question, in *Board, etc., v. Common Council of Detroit*, 28 Mich. 228, he said: " Conceding, as we already have, the general right of the Legislature to prescribe the duties and authority of municipal of-

ficers, it would nevertheless be easy to demonstrate that unless there are some limitations upon that right, the constitutional guaranty of local self-government would be without meaning or value. Many things might be suggested so utterly destructive of the local municipal institutions, which have been handed down to us, that the most strenuous advocate of the legislative authority would admit without hesitation that they were forbidden by the Constitution. If we may suppose, for an illustration, that the Legislature shall provide that in Detroit a single person may be chosen in whom may be vested the whole legislative authority of the city, and all other authority pertaining to local government of every description and nature, not expressly by the Constitution confided to officers specified, it would require unusual boldness in any one who should undertake to defend such a local dictatorship as something within the competency of legislation under a Constitution avowedly framed to guard, protect and defend the local powers and local liberties."

In this case the Legislature has undertaken to place in the hands of three men the exclusive control of all the streets, alleys, lanes, thoroughfares, bridges and culverts in the city of Indianapolis, without the consent of those to be affected thereby, with full power to improve, alter or change the same in any manner they may choose, with the exclusive power to employ all the assistance they may desire, including legal counsel, and fix their salaries and compensation in such sums as they, in their unrestrained judgment, may think proper, without any accountability to any one. Not only that, but these three men are given absolute and exclusive control over the construction of all sewers, the water supply and supply of lights, with no voice in the matter left to the people of the city. If the Legislature may put these matters in the hands of three men, why not in the hands of one man? And if they may transfer these matters, why may they not transfer others? In other words, the effort is by this act to take from the city all control over the improve-

ments of the city, without the consent of her people, and place it in the hands of the agents of the State chosen by the Legislature, and charge the people of the city with the whole expense.

We do not think that the people have conferred upon the Legislature any such power. It is subversive of all local self-government, a right that the people did not surrender when they adopted the Constitution. They still retained, after the adoption of that instrument, the right to select their own local officers, and every effort to deprive them of such right must be held to be beyond the power of the Legislature. In our opinion the entire act attempting to create a board of public works and affairs for cities having a population of fifty thousand or more, is in conflict with the Constitution, and is void.

In coming to this conclusion we have not been unmindful of the fact that authorities are to be found which would seem to lead to a different conclusion, but the authorities upon which we rely seem to be based upon the better reason. In support of the conclusion reached in this case, we cite : *People* v. *Albertson*, 55 N. Y. 50 ; *People* v. *Hurlbut*, 24 Mich. 44 ; *People* v. *Common Council of Detroit*, 28 Mich. 228 ; *People* v. *Lynch*, 51 Cal. 15.

We are asked to decide other questions in the case involving the validity of the act in question, but as we have reached the conclusion that it is void, as being in conflict with the Constitution, we do not deem it necessary to extend this opinion.

We find no error in the record for which the judgment of the superior court should be reversed.

Judgment affirmed.

Filed April 24, 1889.

### SEPARATE OPINION.

ELLIOTT, C. J.—The importance of the questions involved must serve as my apology for outlining my views, for they are

not very different from those embodied in the principal opinion.

The question in this case, so far as it directly involves the appointing power of the General Assembly, is, as it seems to me, this: Has that body the power to appoint local officers, county, township, town or city? Those who affirm that it has that power, necessarily affirm that it may take it from the people of the locality. This I deny.

By the express declaration of our Bill of Rights, all power is inherent in the people, but this is nothing more than the expression of a principle that is older than the Constitution, and exists by its own innate vitality and vigor. It needed no constitutional declaration to invest the people with power, but it does require a constitutional provision to take it from them in whole or in part. This inherent power includes the right of the people to choose their rulers. An essential part of this inherent power, as it has been asserted and exercised for many years, is the right of the electors of a locality to choose their own immediate officers. In my judgment our Constitution does not take away this right, but leaves it in the people, undiminished and undisturbed. There it has resided for ages, and there it is to reside until the people shall, in due course, change their organic law. The right existed in the free cities which formed the famous Hanseatic league, and the sturdy maintenance of this right did as much as any other one thing to arouse and keep alive the spirit of liberty throughout Europe. The right is carefully protected in the great charter of English liberty, and has ever been one of the cherished rights of freemen. It found in the towns and villages and cities of New England even a stronger and broader expression than it had in the mother country. 2 Bryce Am. Com. 567. By naming cities municipal corporations the right of local self-government was indicated as existing in their inhabitants. We get our term "municipal corporations," from the words "*municeps*," or "*municipitis*,"

meaning, I may say, without professing to be strictly accurate, "the right of a freeman"—the right to vote. In a recent work the meaning of the word "municipal" is thus illustrated: "Pertaining to local self-government." 5 Encyclopædic Dict. 131. Our Constitution recognizes and preserves this right, and the thought of destroying it never entered the minds of the men who framed that instrument. If the proposition to impair or destroy it had been made in the convention, I am sure, judging from the tone of the debates and the course of the proceedings, that it would have been sternly and effectually condemned. Before, and since, the adoption of our present Constitution, the uniform practice has been for the people to choose their local officers, and this practice is in harmony with the spirit and purpose of our system of government. By this long continued exposition a force and effect have been given to the Constitution that no department of the government is at liberty to disregard. The system of local self-government which prevails in America has commanded the admiration of such great thinkers as De Tocqueville, Lieber and others, and it has been said that it is one of the "greatest safeguards of civil liberty." Professor Lieber says: "Self-government, general as well as local, is indispensable to our liberty." Thomas Jefferson said: "These wards, called townships in New England, are the vital principle of their governments, and have proved themselves the wisest invention ever devised by the wit of man for the perfect exercise of self-government, and for its preservation. As Cato, then, concluded every speech with the words '*Carthago delenda est*,' so do I every opinion, Divide the county into wards." These words of wisdom influenced our people and the framers of our organic law, and they should so influence our courts that they may not depart from the fundamental principle of self-government. The right of local self-government is, indeed, one of the strongest and most efficient checks in our system of checks and bal-

ances which John Adams and the other great statesmen of his time so earnestly labored to perfect and establish.

If the power to appoint to office were inherently or intrinsically a legislative one, then there would be much more strength in the contention that the General Assembly may appoint local officers, but it is not an intrinsic or inherent legislative power except in so far as it is as an incidental power, essential to the existence of the legislative branch as an independent department of the government. There are provisions in the Constitution which do confer upon the General Assembly a limited appointing power. Some appointing power that instrument does, as I believe, vest in the General Assembly, and a practical exposition, to which it is our duty to yield, has given a construction to the provision vesting that power, and to some extent has measured it. The Legislature has for many years assumed the power in a class of cases either by directly exercising it or by authorizing the executive to exercise it, and this assumption of power has been acquiesced in by all the departments of the government and by the people. The existence of a limited appointing power in the General Assembly has been, in some few instances, recognized by the judiciary, but there is, as I think, no direct adjudication upon the extent of the power possessed by that body. In my judgment the appointing power which the General Assembly possesses—aside from that incidental right of appointment resident in every independent branch of the government—is limited and confined to a class of offices, and to this class local municipal offices, whether county, township or city, do not belong.

It was said in argument that our English ancestors fought to abridge the executive power and to extend that of parliament. This is true of the earlier years of British history, but it is equally true that, as the years passed, the legislative power of England so dominated and overshadowed the executive as to make parliament omnipotent. Judge Wilson, of Pennsylvania, one of the very ablest of the members of

the great body which framed the Federal Constitution, taking as his text the saying of one of England's greatest statesmen, that "England can never be ruined but by a parliament," demonstrates the danger of allowing to the legislative department any other than strictly legislative power. The judges of the Supreme Court of the United States joined in a letter to President Washington upon the general subject, insisting upon a scrupulous and undeviating maintenance of the principle of the separation of the departments. Jefferson, Madison and Hamilton wrote earnestly upon the question, and all of these great men, as, indeed, many others, united in earnestly protesting against tolerating the claim of the legislative department to exercise any other than legislative power. Modern writers have not been less earnest in their protests and warnings against the encroachment of the legislative department. A change has taken place within the last century and a half, and the fear of the great men of our country has been of legislative encroachment, not of executive usurpation. Over and over again have the jurists, statesmen and publicists warned the people that the legislative department is the overmastering one, and that the tendency is almost irresistibly in the direction of a despotic centralization of power in that department. We must presume that the framers of our Constitution knew the history of the times, perceived the danger of centralized power, and gave heed to the utterances of the great men who moulded public opinion and gave tone to public thought, and, acting upon this presumption, we can not do otherwise than conclude that the members of our convention did not intend to augment legislative power and bring about that condition which the great thinkers earnestly affirmed was so full of peril. In Cromwell's time the fear was of executive usurpation; in 1850 the fear was—as the writers all declare it still is—of legislative encroachment. The historic argument is, therefore, against, and not in favor of the legislative assertion of the appointing power.

The right to choose officers is primarily and inherently in the people. Primarily it is neither an executive nor a legislative function. Except as expressly or impliedly delegated to the executive or the legislative department, it resides entirely in the electors of the State. Silence on the subject takes no part of the power from the people, and vests none in their representatives. *Johns* v. *State*, 3 Or. 533; *People* v. *Bull*, 46 N. Y. 57; *Speed* v. *Crawford*, 3 Metcf. (Ky.) 207.

It is the duty of all the departments of the government to make provision, or to aid in making provision, to secure, as far as possible, this right to the people in its integrity. The predominant purpose of our present Constitution was to make few appointive offices and many elective ones. This purpose is manifested in the body of the instrument, is revealed in the debates and proceedings, and is strikingly shown in the provisions of the schedule which vacated all offices which the Constitution of 1816 gave the Legislature power to fill by appointment.

That the whole purely legislative power of the State is vested in the General Assembly, is true, but that the Constitution vests in that body, except in a few enumerated instances, any other than legislative powers, is not. Article 3 enumerates and distributes the powers of government, and prohibits their centralization in any one department. Articles 5, 6 and 7 define the powers of the executive, administrative and judicial departments, while article 4 vests and defines the legislative power. The first section of that article ordains that " The legislative authority of the State shall be vested in the General Assembly," and section 16 declares that " Each House shall have all powers necessary for a branch of the legislative department of a free and independent State." These provisions limit the power of the General Assembly to one of the three independent departments—the legislative—for it is a principle of logic and of law that the express mention of one thing implies the ex-

clusion of all others. *In re Courts of Lancaster,* 4 Clark (Pa.), 501; *King* v. *Hopkins,* 57 N. H. 334; *Turner* v. *Althaus,* 6 Neb. 54. The limitation in section 16 is, indeed, a two-fold one. That section not only limits the power to the legislative department, but it also limits it to the legislative department of a free and independent State. *In re Courts of Lancaster, supra.* The power of the General Assembly is, therefore, the power of the Legislature of a free State, and, since the time of Montesquieu—indeed, for centuries before he wrote, for he did no more than develop a well known principle—it has been affirmed by philosophers, statesmen and jurists that no free State can exist if different governmental powers are concentrated in one body. All agree that the concentration of power inevitably results in despotism. *Merrill* v. *Sherburne,* 1 N. H. 199 (201); *Hawkins* v. *Governor,* 1 Ark. 570 (590, 592); *People* v. *Albertson,* 55 N. Y. 50 (55); Jefferson's letter to Kercheval, July 12th, 1816; 5 Elliott Const. Debates, 327, 337; Pomeroy Const. Law, sections 169, 643; Federalist Letters, 47, 48; 1 Von Holst Const. History, 29; 1 Curtis History of Const. 119; Wilson Cong. Government, 12, 36; Lieber Civil Liberty, 154.

Although the provisions of the Constitution delegating legislative power to the General Assembly are, except where other than legislative powers are specifically conferred upon it, in themselves sufficient to confine that body to a single department of the government, they are not to be considered without reference to the provisions separating the departments and distributing the powers of government, but are to be taken in connection with them, and when they are thus considered it is clear that, as Mr. Bryce says, "a Legislature is a Legislature and nothing more." 1 Am. Com. 429. The Legislature was likened in argument to the sea, and the figure may not be altogether inapt, but it is incomplete, for it omits the important element that the legislative sea is not a shoreless one. "The Constitution is the shore," it has

been said, "against which the waves dash, but over which they can not leap."

It is no doubt true that the Legislature does, as I have said, possess, as an incidental right, the power of appointment, for this it would have without any specific grant, since this limited power must exist in every department or it can not be independent.   The Legislature does not, in my opinion, either by express grant or by implication, possess any general and unrestricted appointing power.   It is generally agreed that the power of appointment is intrinsically an executive power ; it is, at all events, not properly a law-making power.   It is one thing to make a place for a man by enacting a law, and another thing to put him in that place. The one thing is purely and intrinsically legislative ; the other is not.   *State* v. *Barbour*, 53 Conn. 76 ;  *Taylor* v. *Com.*, 3 J. J. Marsh. 401 ;  *Perkins* v. *United States*, 20 Ct. of Claims R. 438 ;   *United States* v. *Perkins*, 116 U. S. 483 ;  *Achley's Case*, 4 Abbott Pr. R. 35 ;  *People* v. *McKee*, 68 N. C. 429 ; Federalist Letters, 47, 48 ; Broom Const. Law, 524.

One who reads the debates and proceedings of the convention which framed our Constitution can not fail to perceive that a great purpose, if not the leading purpose, of the convention was to abridge the appointing power of the General Assembly.   This purpose is apparent in all the important measures and speeches, and that the members of the convention believed that they had accomplished it, is evident.   One of its distinguished members, Hon. William S. Holman, said :  " It will be recollected that we do not intend to confer upon the Legislature the power of appointing.   There may possibly be two or three offices the appointment to which will be vested in the Legislature, but the great body of them are to be filled by election, by the people."   2 Const. Debates 1238.   This was said after the convention had been in session for many days, and after the subject had been discussed in various forms, so that it was not the statement of one not well informed.   Nor was the statement denied ; on the con-

trary, it was acquiesced in by all, even by those who were opposed to Mr. Holman on the particular phase of the question then under immediate discussion. I have given such study to the public discussions that led to the call of our convention of 1850, as the pressure of duty would permit, and find that one of the reforms most earnestly called for was a limitation upon the power of the Legislature to appoint to office. It is always proper to look to the history of the times and to the debates of the convention to determine the purpose of the framers of the Constitution, and, looking to these things, it is quite clear to my mind that the framers of the Constitution did not intend to confer any general appointing power upon the Legislature, but that they did mean to abridge rather than extend that power. The chief purpose was to remove the restrictions upon the power of the people, and to leave in them the right of choosing their officers.

Assuming that the General Assembly has some appointing power, still it can not, in any event, be granted that it extends—if, indeed, it extends so far—to any other officers than officers of the State, in the broadest sense of the term. An officer of a municipal corporation is not a State officer, and, therefore, as has been expressly adjudged, the same person may, at the same time, hold a municipal office and a county or State office without violating the provision of the Constitution which forbids one person from holding two lucrative offices. *State, ex rel.*, v. *Kirk*, 44 Ind. 401; *Mohan* v. *Jackson*, 52 Ind. 599.

The General Assembly represents the whole State. This is so in legal contemplation and should be so in fact. One of the evils of legislation which writers have often censured is that of legislating for localities at the expense of the general weal, and it was to check this evil that our Constitution forbade local legislation. As the General Assembly represents the State at large, and as municipal officers are not State officers, the General Assembly can have no power to appoint them. Another element deserves consideration here,

and that is this: The municipal corporation as a local government is not represented by the General Assembly, and to permit that body to designate the officers who shall govern local affairs would be to tax the citizens of the corporation without representation. This, it is hardly necessary to say, would violate a principle which lies at the foundation of free government. It is no answer to say, as is sometimes said, that the municipal corporation has representatives in the General Assembly, for, as a municipal corporation, it is not, as to its local affairs, represented by that body, for that body represents the State and legislates in State affairs. Incidentally it legislates, in a general way, for localities, but only because the welfare of the whole State is thereby promoted. As a part of the constituency of the Legislature the citizens of a town or city are represented, but they are represented in the capacity of citizens of the State and not as the inhabitants of a municipal corporation. A town or city has but little power in any General Assembly, and to permit that body to control their local affairs would put them in charge of men from distant parts of the State who could have little, if any, knowledge of local affairs and no direct interest in them, so that the inhabitants of such a town or city would be governed by persons who did not and who could not, in the just sense of the term, represent them, and this result our Constitution will not tolerate.

I do not deny that the Legislature has the power to change the form and mode in which municipal corporations shall be governed; on the contrary, I affirm that without the consent of the inhabitants the form of the corporate government may at any time be altered, but I do deny that the Legislature has the power to deprive the electors of a municipal corporation of the right to choose their own immediate local officers. By immediate local officers, I mean such as are charged with the control of purely local concerns, as the streets, the fire apparatus, and the like matters. In the class of local officers I do not include the peace-keeping officers,

or the constabulary, for such officers are, in reality, officers of the State, as it is the duty of the State to provide for the personal safety of its citizens on the thronged streets of a great city as well as on the secluded rural highways. What I affirm, in short, is this: That because an elector lives in a city he can not have the right to vote upon purely local affairs taken from him by any statute.

The decisions which declare that the State may appoint peace officers in cities can be sustained only upon the ground that such officers are State officers and not local officers. The principle is one not to be extended, but to be limited. That venerable and able judge, CAMPBELL, of Michigan, who has so long occupied a high position among the judges of this country, so clearly expresses what I conceive to be the true rule that I can not forbear copying his language: "Up to this time," he says, "and ever since elections were first held in Michigan, they have not only been localized in some municipal division, but regarded as municipal action and supervised and managed by municipal officers either directly elected or else appointed by those who have been elected. Such a board as this, which is in no sense a mere agency of the city, is foreign to our system. If it can be created in a city, it may just as well be created in a county, or for the State. When the election ceases to be a municipal procedure, the whole foundation of municipal government drops out. And a municipality which is not managed by its own officers is not such a one as our Constitution recognizes." *Attorney General* v. *Detroit Common Council*, 58 Mich. 213. In the same case, MORSE, C. J., said: "I fully agree in the views so ably expressed by Justice CAMPBELL in the leading opinion filed in this cause. The nearer the officers are to the people over whom they have control, the more easily and readily are reached the evils that result from political corruption, and the more speedy and certain the cure. The form of our State government presupposes that the people of each locality, each mu-

The State, *ex rel.* Jameson *et al.*, *v.* Denny, Mayor.

nicipal district or political unit, are intelligent and virtuous enough to be fully capable of self-government."

Continued and uniform exposition, broken by this act for the first time in the whole history of our State, supports the views of the majority of the court upon the question of the right of the citizens of a political corporation, such as a county, township or city, to choose their own local officers. The essential and abiding principle of local self-government supports it. The rule that the people, whose property is liable for municipal debts, should choose those to whom they will entrust the management of their local affairs yields it support. The rule that the Constitution recognizes the principle that the people of a locality can govern themselves honestly and intelligently, without the direct guardianship of persons representing the State at large, gives it support of no uncertain character. The broad principle that laws shall be uniform throughout the State, and that the electors of some localities shall not be disfranchised while others are left with the undiminished rights of freemen, supports it.

Discrimination in legislation is never just, unless there is a valid and substantial reason for the discrimination, and there can be no reason for disfranchising voters in a city that has thirty thousand inhabitants that does not exist for disfranchising them in a city of twenty thousand, or one thousand, inhabitants. It was to prevent such discrimination that our Constitution forbids class legislation of every kind.

Filed April 24, 1889.

## DISSENTING OPINION.

MITCHELL, J.—The important question for consideration arises out of the proposition that local self-government, as applied to the regulation of municipal affairs, under the Constitution of the State of Indiana, is an inherent right of the people, " older than any American Constitution," not conferred upon them by the Legislature ; that it is an " insep-

arable incident " to republican government, and entirely beyond legislative interference.

It is affirmed that the enactments involved in the present case, and in some other cases before the court, while not in contravention of any express constitutional provision, violate these fundamental maxims of government, and that it is hence the duty of the court to declare them void and arrest their execution. This is the breadth and proportion of the question.

The rule under which the General Assembly and the courts of this State have heretofore proceeded in the enactment and interpretation of statutes is, that the authority of the Legislature is supreme, and subject to no limitations except such as are imposed by the Constitution of the State, the Constitution of the United States, and the laws and treaties made under it.

This rule of interpretation is firmly imbedded in the jurisprudence of all the States, and has become part of the American system. Often as the effort has been made to erect some other standard, the courts have declared that, until some express provision of the Constitution could be pointed out which the Legislature, in the enactment of a law, had disregarded, judicial interference could not be successfully invoked. *Beauchamp* v. *State,* 6 Blackf. 299 ; *Lafayette, etc., R. R. Co.* v. *Geiger,* 34 Ind. 185 ; *Campbell* v. *Dwiggins,* 83 Ind. 473 ; *Hedderich* v. *State,* 101 Ind. 564.

Public statutes are not to be regarded as common enemies, whose speedy extermination is specially committed to the courts. The power to declare a statute void is one of the highest possessed by any judicial tribunal in the world, and everywhere the authorities say this power is only to be exercised with the utmost care, and after all doubts as to the constitutionality of the law have been dispersed. *Robinson* v. *Schenck,* 102 Ind. 307.

The Constitution has erected no standard by which to determine what constitutes local self-government, or what are natural and inherent rights, as those terms relate to mu-

nicipal government. These are questions of political, and, therefore, of exclusively legislative concern, with which other departments can not interfere without invading the legislative domain.

Disputes over theories of local self-government began with the organization of civil society, and they will doubtless continue until human government ends. Publicists and doctrinaires, whose writings are appealed to, are not agreed concerning the natural and inherent rights of men, as related to government, nor is it best they should agree. Our State Constitution was adopted by the people, as a well matured scheme of practical, progressive government, and its written limitations may be readily comprehended by intelligent men who are called to engage in framing legislation adapted to the growing needs of every portion of the State. Progress is at an end, however, if legislation must wait until the courts set bounds to the shoreless sea of local self-government, or until the judiciary ascertains and declares what are the "inseparable incidents" to written Constitutions under our republican system.

The debate on those subjects must be left free, open and unfettered, and it must be left, as all the authorities say, exclusively with the people and their chosen representatives. The judiciary can not debate. Courts give judgment, which means that discussion is ended. Hence the rule that the authority of the Legislature in the enactment of laws is supreme, and subject to no restrictions, save only such as are found written in the organic law. Hence the further rule that courts can not interfere to set aside an act of the Legislature, on the ground that it is opposed to a spirit that is supposed to pervade or underlie the Constitution, or that it contravenes the natural rights of society or the general principles of local self-government. Although the Constitution is to be regarded as having been framed and adopted with all these principles in view, until they have been declared in

terms in that instrument they do not become subjects for judicial interpretation.

Speaking of limitations upon legislative authority, Judge Cooley, the value of whose opinions will not be questioned, has well said : " Some of these are prescribed by Constitutions, but others spring from the very nature of free government. The latter must depend for their enforcement upon legislative wisdom, discretion, and conscience. * * * Where the power which is exercised is legislative in its character, the courts can enforce only those limitations which the Constitution imposes ; not those implied restrictions which, resting in theory only, the people have been satisfied to leave to the judgment, patriotism, and sense of justice of their representatives." Cooley Const. Lim. (5th ed.) 153 ; *Walker* v. *City of Cincinnati,* 21 Ohio St. 14; *State* v. *McCann,* 21 Ohio St. 198 ; *Adams* v. *Howe,* 14 Mass. 340 (7 Am. Dec. 216). Very many judicial decisions support this view, and there are none to the contrary.

The same learned author lays it down as an established rule, that courts can not declare a statute unconstitutional because it is supposed to violate the natural, social or political rights of the citizen, unless it can be shown that the legislation is inhibited by the Constitution, and he asserts that, while some expressions may be found in the opinions of judges which have been understood to intimate a different doctrine, these expressions were used merely by way of illustration or argument, rather than as laying down a rule by which courts could apply limitations to legislative action. Cooley Const. Lim. 197–201. These principles have found expression in the decisions of every court, and in every textbook where the subject has been considered. Thus, in *Beebe* v. *State,* 6 Ind. 501, 528, this court, speaking by STUART, J., said : " Such is the imperfection of the best human institutions, that mould them as we may, a large discretion must at last be reposed somewhere. The best, and in many cases the only security, is in the wisdom and integrity of public

servants, and their identity with the people. Government can not be administered without committing powers in trust and confidence." Said ROGERS, J., in *Commonwealth* v. *Mc-Closkey*, 2 Rawle, 369 : "If the Legislature should pass a law in plain, unequivocal, and explicit terms, within the general scope of their constitutional power, I know of no authority in this government to pronounce such an act void, merely because, in the opinion of the judicial tribunals, it was contrary to the principles of natural justice. * * * This would necessarily lead to collisions between the legislative and judicial departments, dangerous to the well-being of society."

The legislature must be the sole judge of whether or not an act is in violation of the principles of local self-government, unless those principles are defined in terms in the Constitution, and it must be assumed, in the absence of constitutional definition, that these principles are as well understood by the Legislature as by the courts. If an act is in violation of the Constitution, the courts should, when clearly convinced that it is so, unhesitatingly declare it void, but as was said in *Sharpless* v. *Mayor, etc.*, 21 Pa. St. 147 : "We are urged, however, to go further than this, and to hold that a law, though not prohibited, is void if it violates the spirit of our institutions, or impairs any of those rights which it is the object of a free government to protect." This the court declined to do, and declared that until it appeared that the act was in violation of some provision of the Constitution, it was not a subject for judicial cognizance. This must, in the nature of the case, be the only true and safe rule by which courts can be guided. If, over and beyond the express limitations imposed by the Constitution, the theories of local self-government, as the courts may interpret them, are to operate as limitations upon the Legislature, confusion and uncertainty must inevitably result. Nor is the problem solved by assuming that the science of municipal government had attained such a degree of perfection when the Constitution was adopted as that all inquiry concerning the principles of local

self-government must be referred to the methods which prevailed at that period. As was said in *Ohio* v. *Covington*, 29 Ohio St. 102 : "By such interpretation of the Constitution, the body of the laws in force at the time of its adoption would have become as permanent and unchangeable as the Constitution itself."

The inquiry may be pertinently made, how are the boards of health, police, fire and other departments of municipal government, in the cities affected by the legislation here denounced, to be organized or constituted in the future? Are these cities to be turned back, by the judgment of the court, forty years to the methods that prevailed at that time? Who shall say how these indispensable departments of city government are to be organized and their members chosen, so as to conform to the principles of local self-government. Must the cities, the courts or the Legislature determine?

It is impossible to discuss the subject of the power of the Legislature over municipal corporations without repeating much that has already been said by courts. The agglomeration of population into great cities, and the commercial and manufacturing interests that ensue, have produced the necessity for legislation such as that here involved in almost every State in the Union. The validity of such legislation has often been questioned before; it is not a subject new to the courts of the country, and it is believed that an unbroken line of decisions can be presented which uniformly sustain the formation of boards for the control of the local affairs of cities which affect the health, safety and convenience of persons, and the protection of life and property within the municipalities. The decisions which are relied on as holding a contrary view, were, it is submitted, in every instance controlled by express constitutional provisions, and present no exception to the current of authorities, which is overwhelming and without conflict, as can readily be shown, in support of the view here taken.

Municipal corporations are bodies politic and corporate,

created by the Legislature as governmental agencies of the State, and they can only exercise such power as they derive from the source of their creation. Such powers as they exercise are at all times subject to legislative control, and in the absence of constitutional prohibition their powers may be enlarged or diminished, or withdrawn altogether, and their property devoted to other uses, as the Legislature may determine. *Rogers* v. *Burlington,* 3 Wall. 654; *Commissioners* v. *Lucas,* 93 U. S. 108; *Hamlin* v. *Meadville,* 6 Neb. 227; *Touchard* v. *Touchard,* 5 Cal. 306; *Mather* v. *City of Ottawa,* 114 Ill. 659.

The relations which municipal authorities sustain to the State are definitely fixed and were accurately expressed at a very early period in the history of this State.

In *Sloan* v. *State,* 8 Blackf. 361 (364), this court declared that "Public or municipal corporations are established for the local government of towns or particular districts. The special powers conferred upon them are not vested rights as against the State, but being wholly political exist only during the will of the General Legislature, otherwise there would be numberless petty governments existing within the State and forming a part of it, but independent of the control of the sovereign power. Such powers may at any time be repealed or abrogated by the Legislature, either by a general law operating upon the whole State, or by a special act altering the powers of the corporation."

This was the law as settled by the judicial department of the government when the present Constitution was adopted, and it must be presumed that if it had been deemed wise to impose restrictions on the Legislature, so as to secure municipal corporations against legislative interference, it would have been done by some direct method. Judge Cooley expresses the controlling idea when he says: "It is also a maxim of republican government that local concerns shall be managed in the local districts, which shall choose their own

administrative and police officers, and establish for them-selves police regulations; but this maxim is subject to such exceptions as the legislative power of the State shall see fit to make; and when made, it must be presumed that the public interest, convenience, and protection are subserved thereby. The State may interfere to establish new regulations against the will of the local constituency." The conclusion laid down by this eminent judge is, that the maxims which have prevailed in the government, address themselves to the wisdom of the Legislature, and that their supposed violation by that body affords no warrant for judicial interference. Cooley Const. Lim. (5th ed.) 203, 204, 205.

The Legislature represents the public at large, and has complete and paramount authority over all the public highways and over all property devoted to public uses in the State. Streets, sewers and public drains exist only by authority of the State and in pursuance of public law. They are provided for the use of the public, and can only be compulsorily opened or improved by the power of the State. They are as much under State regulation as are rivers, railroads, canals or other public roads laid out or improved by the authority of the State. *O'Connor* v. *Pittsburgh*, 18 Pa. St. 187; *Stormfeltz* v. *Manor T. P. Co.*, 13 Pa. St. 555; *Com.* v. *Plaisted*, 2 Lawyers' Rep. Ann. 142, and note.

The error which lies at the root of the argument by which the unconstitutionality of the acts here in question is attempted to be maintained, springs out of the fallacious assumption that the people of a city or town have any interest or inherent right whatever to municipal government, while every atom and vestige of right in those respects, under our system, are such, and only such, as the Legislature confers. Upon this baseless assumption, which obliterates and confounds all distinctions between municipal regulation, a creature of legislation, and county and township government which existed before Legislatures were, and which is, and always was, common to every community in the State, the

whole fabric of argument adverse to the constitutionality of these acts is builded.

It is common learning, said Mr. Justice FIELD, in *Meriwether* v. *Garrett*, 102 U. S. 472, " found in all adjudications on the subject of municipal bodies, and repeated by textwriters," that " municipal corporations are mere instrumentalities of the State for the more convenient administration of local government. Their powers are such as the Legislatures may confer, and these may be enlarged, abridged, or entirely withdrawn at its pleasure." In the case cited it was held that the power delegated to a city by the State might be withdrawn, and that when withdrawn, the public buildings, streets, squares, parks, fire engines, and all other property held by the city for public uses, passed under the immediate control of the State. The same high tribunal, speaking of the relations which municipal corporations sustained to the States, said, in *United States* v. *Railroad Co.*, 17 Wall. 322, 329 : " It is one of its creatures, made for a specific purpose. * * * The State may withdraw these local powers of government at pleasure, and may, through its Legislature or the appointed channels, govern the local territory as it governs the State at large." See, also, *Mobile* v. *Watson,* 116 U. S. 289. In *Philadelphia* v. *Fox,* 64 Pa. St. 169, a case altogether parallel in principle with the present, after declaring that a city was merely an agency having no vested rights in the powers conferred upon it, and, therefore, fully subject to the control of the Legislature, SHARSWOOD, J., said that the sovereign might continue the corporate existence of the city, " and yet assume or resume the appointment of all its officers and agents into its own hands ; for the power which can create and destroy can modify and change." " No one," continued the learned judge, " I think can doubt that it was entirely competent for that authority to vest the entire management and control of all municipal affairs in just such a body as that constituted by this act. If they could do the greater, they can do the less." See, also, *People* v. *Flagg,*

46 N. Y. 401. In *People* v. *Mahaney*, 13 Mich. 481, wherein the power of the Legislature to create a police board, to be filled by appointment by the Governor, was sustained, it was declared by COOLEY, J., that legislation in violation of sound political principles, but which does not infringe the Constitution, can not be declared void.

In *People* v. *Draper*, 15 N. Y. 532, this whole subject received most careful consideration in construing a provision of the Constitution of the State of New York, which declared that "All officers whose offices may hereafter be created by law shall be elected by the people or appointed as the Legislature may direct." It was held that the Legislature was at liberty to provide for the election or appointment, in any manner it deemed suitable, of all officers, local or general, whose offices were created by law, the mode of whose election or appointment was not prescribed by the Constitution. In upholding an act of the Legislature establishing a metropolitan board of police in certain counties, embracing the cities of New York and Brooklyn, Chief Justice DENIO said : "As a political society, the State has an interest in the repression of disorder, and the maintenance of peace and security in every locality within its limits. * * It is within the discretion of the Legislature to apply such legislation as, in its judgment, the exigency of the case may require ; and it is the sole judge of the existence of such causes. It has been said that a tendency may be discovered in the Constitution, toward local administration. * * This I believe to be true. * * * It may be the duty of the Legislature to follow out or advance such a line of policy, but the business of the courts is with the text of the fundamental law as they find it. They have no political maxims and no line of policy to further or to advance. Their duty is the humble one of construing the Constitution by the language it contains." See, also, *People* v. *Shepard*, 36 N. Y. 285.

It is sufficient to say in respect to the case of *People* v. *Albertson*, 55 N. Y. 50, which is claimed as lending support to

a conclusion adverse to the constitutionality of the legisla-
tion here involved, that the decision of the case rests explic-
itly on the construction of section 2 of article 10 of the Con-
stitution of New York, which declares that "All city, town,
and village officers, whose election or appointment is not pro-
vided for by this Constitution, shall be elected by the electors
of such cities, towns or villages, or of some division thereof, or
appointed by such authorities thereof, as the Legislature shall
designate for that purpose."

A provision in the Constitution of the State of Michigan,
which controlled the judgment of the court in *People* v. *Hurl-
but,* 24 Mich. 44, the case chiefly relied upon to support the
conclusion that the acts here in question are invalid, while
not strictly identical in phraseology with that above set out,
was construed to be identical in meaning with it. In these
cases, in which it appears that local self-government was ex-
pressly guaranteed to municipal corporations in the organic
law of the State, occur the forcible arguments and apt illus-
trations upon which the judgments of the courts rest. Ac-
cordingly, Judge COOLEY could well declare, as he did : " It is
a fundamental principle in this State, recognized and per-
petuated by express provisions of the Constitution, that the
people of every hamlet, town, and city of the State, are en-
titled to the benefits of local self-government." *People* v.
*Common Council of Detroit,* 28 Mich. 228.

That eminent jurist was not chasing the shadowy phan-
tom of a " latent spirit," or of the " inalienable right of local
self-government." He rested his judgment, where all courts
have rested theirs, on the solid rock of an express provision
of the Constitution he was expounding, in the light of the
great principles to which he referred by way of illustration
and argument.

No such declaration can be made with respect to the Con-
stitution of Indiana, without first interpolating something
into it which those who framed it omitted.

A board of health and a board of police commissioners for

the city of Cincinnati were created by the Legislature of the State of Ohio in 1876. The members thereof were appointed by the Governor, in pursuance of authority conferred in the law. It was contended, in a case involving the constitutionality of the act, that because the officers composing similar boards were elective, by the electors of the several cities in the State of Ohio, at the time of the adoption of the Constitution, the act authorizing the Governor to appoint was in violation of the principles of local self-government. On the subject of the power of the Legislature to pass such a law the court says: "Rules and regulations for local municipal government of cities and villages are subjects of and are as clearly within the scope of legislation as are those which concern the State at large. Cities and villages are agencies of the State government. Their organization and government are under the control of the State, and every law which affects them must emanate from the General Assembly, where the legislative power of the State is vested." *Ohio* v. *Covington*, 29 Ohio St. 102. *Diamond* v. *Cain*, 21 La. Ann. 309; *Police Commissioners* v. *City of Louisville*, 3 Bush, 597; *State* v. *St. Louis County Court*, 34 Mo. 546.

The Supreme Court of the State of Kansas, speaking of the constitutionality of an act establishing a board of metropolitan police, used the following language: "In effect, it is said to be opposed to the fundamental theory of self-government, and denies to the people of the district the right to select their own officers from among their own number. Whatever may be said regarding the policy of placing the police administration of cities in a board of police commissioners who are chosen by State officers rather than through the electors of the cities, there can be no doubt that the Legislature has the power to do so." *State* v. *Hunter*, 38 Kan. 578. In like manner, the supreme judicial court of Massachusetts, in vindicating the constitutionality of a statute of that State from all the objections urged against the one here involved, said: "We find no provision of the Con-

The State, *ex rel.* Jameson *et al.*, *v.* Denny, Mayor.

stitution with which it conflicts, and we can not declare an act of the Legislature invalid because it abridges the exercise of the privileges of local self-government in a particular in regard to which such privilege is not guaranteed by any provision of the Constitution." *Commonwealth* v. *Plaisted*, 19 N. E. Rep. 224. An act creating a board of fire and police commissioners was created by the Legislature of the State of Nebraska. The Governor was requested to appoint the members of the board from different political parties, as was the fact in most of the cases already cited. Remarking upon the contention that the act was opposed to the principles of local self-government, the court said : " It is, no doubt, the general spirit of our Constitution and institutions, and in accord with the habits and traditions of our people, that the inhabitants of every subdivision of the State shall have an equal share and responsibility in public affairs, so far as the same shall have been found conducive to the public safety, the preservation of the public peace, and the conservation of the public morals, and in every case of doubt in construing a statute, where such construction might turn upon the recognition and fostering of such spirit, no court would be blind to its duty in that behalf. And yet it is the boast of the American people in every State that they live under a written Constitution and do not look for a guaranty of their rights or liberty to any intangible code of traditions, or the opinions or constructions of any man or set of men." *State* v. *Seavey*, 22 Neb. 454 (467).

In *Mayor, etc.,* v. *State*, 15 Md. 376, after an elaborate and most learned opinion, the court gave judgment establishing the following propositions, which are involved in the present case :

1. " The power of appointment to office is not, under our system of checks and balances in the distribution of powers, where the people are the source and fountain of government, a function intrinsically executive, in the sense that

it is inherent in, and necessarily belongs to, the executive department."

2. "Our form of government in its various changes has never recognized the power of appointment to office as an executive prerogative; the Constitution so far from treating it as an inherent executive power indicates that it belongs where the people choose to place it."

3. "The city of Baltimore and the counties are mere instruments of government appointed to aid in the administration of public affairs, and are parts of the State; as public corporations they are to be governed according to the laws of the land, and are subject to the control of the Legislature. The provision in the police law, which transfers to the commissioners, for the purposes of the new police, the use of the city property is constitutional and valid."

It was also held in the case last cited, as it was in all the others where the question was raised, that the requirement that the boards should be selected from the leading political organizations was merely directory, and did not affect the validity of the law.

The length to which this opinion has grown forbids a particular application of the authorities which support the proposition that the control of streets, the sewerage and water supply, the fire and police departments, in a populous city, are all subjects of public concern to the State, and therefore subject to legislative control. These subjects all relate to the public convenience, the public health and safety, and to the protection of persons and property.

An examination of the numerous authorities in which not only the general subject examined in this opinion, but every feature of the opposition to the enactments in question, has received the careful consideration of the courts of last resort, both State and National, and which have by their deliberate judgments again and again vindicated the constitutionality of legislation like that here assailed, leaves no room for doubt

concerning the validity of these statutes. *State* v. *Smith,* 44 Ohio St. 348.

In this last case, it is tersely and accurately said that the distinctions sought to be made in some cases, in matters pertaining to the public and proprietary character of municipal corporations, are illusive and without foundation. 1 Dill. Munic. Corp., section 67; *People* v. *Draper, supra; Darlington* v. *Mayor,* 31 N. Y. 164 (193); *State* v. *Seymour,* 35 N. J. L. 47; *State* v. *Valle,* 41 Mo. 29; *Daley* v. *City of St. Paul,* 7 Minn. 390.

This legislation, it hardly needs be said, is to be construed with reference to the Constitution of Indiana as it is. It is the deliberate judgment of the writer, that, without in effect interpolating into our Constitution a provision similar to that contained in the Constitutions of the States of New York and Michigan, and also that which controlled the judgment in *State* v. *Kennon,* 7 Ohio St. 546, there can be no judicial authority found anywhere to support a conclusion adverse to any of the statutes the validity of which is in question.

Regretting the diversity of opinion which has resulted, the foregoing are the grounds upon which my dissent in this and the other similar cases is based.

Filed April 24, 1889.